**William Gibbs HYMAN, Appellant,**

v.

**James AIKEN, Warden, CCI, and Travis Medlock, Attorney General, State of South Carolina, Appellees.**

No. 85–4002.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1986.

Decided Aug. 4, 1987.

Coming B. Gibbs, Jr. (Gibbs & Holmes, Ann M. Stirling, Charleston, S.C., on brief), for appellant.

Donald J. Zelenka, Chief Deputy Atty. Gen. (T. Travis Medlock, Atty. Gen., Columbia, S.C., on brief), for appellee.

Before RUSSELL and WIDENER, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

The Supreme Court vacated the judgment of this court and directed us to consider the conviction and death sentence of William G. Hyman in light of its intervening decisions in *Rose v. Clark,* — U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), and *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986). Upon reconsideration, we reverse the judgment of the district court and remand the case with instructions to grant a writ of habeas corpus unless within a reasonable time the state retries Hyman.

Judge Russell and Judge Widener concur in Parts I, II, III, and VIII of the opinion. Inasmuch as Hyman is entitled to a new trial they believe it is unnecessary to consider the punishment phase of the case; therefore, they do not concur in Parts IV, V, VI, and VII.

Judge Butzner believes that although Hyman is entitled to a new trial on the merits, the Supreme Court's mandate requires review of the punishment phase of the trial in light of *Cabana.* Accordingly, he has set forth his separate views of this issue in Parts IV, V, VI, and VII.

I

In March of 1979, Hyman set out with his wife, Doris, Sue Allday, Robert Hinson, and Iris Midgett to rob two brothers, Teagus and Collins Griffis, at the Griffis' trailer home in Ravenel, South Carolina. Allday, who was least intoxicated, drove Hyman's car. When they arrived at the trailer, Allday and Doris Hyman went to the door and told the brothers they were having car trouble. Turned away once, Allday knocked at the door again. From inside, a voice shouted that he knew they wanted to rob him and threatened to shoot. The door of the trailer opened suddenly and one of the brothers fired a shotgun, wounding Hinson in the leg. Allday fired a return shotgun blast into the trailer. These shots signaled the opening of a melee, which left Teagus Griffis dead from a gunshot to the chest and Collins badly beaten.

In an agreement with the Charleston County solicitor, Allday and Hinson pled

guilty to murder and received life sentences. Midget pled to a charge of accessory before the fact of armed robbery and received an 18–year prison sentence. Hyman, however, refused the plea agreement offered Hinson and Allday even after the solicitor informed him he would seek the death penalty. Hyman told his counsel and others that Allday had killed Teagus Griffis and that he would not plead guilty to a murder he knew he did not commit. Doris Hyman also pled not guilty.

At the guilt phase of Hyman's trial for murder and armed robbery, neither he nor Doris Hyman testified. Allday admitted firing the shot into the open door but denied that it killed Teagus. She testified that she heard a shot and then saw Hyman, with a gun, standing in front of the wounded Griffis. Midgett and James Coulston, an associate of Hyman's, testified that Hyman had later confessed to shooting Griffis. The only witness to the melee who seemed to indicate that he actually had seen the killing take place was Collins Griffis. Griffis testified "the fellow ... shot my brother," stating, "I saw the man, sure. The man was the one who done the killing." [1]

Both the solicitor and the state's witnesses—as well as defense counsel—indicated that Hyman was intoxicated at the time the crime was committed. Allday testified that when she met Hyman on the evening of the robbery he was already intoxicated. She said he continued drinking until the group set out for the Griffis' home two hours later, at which time Hyman considered himself too drunk to drive his own car. Hinson testified that he brought a quart of liquor as well as a shotgun for their trip to Ravenel. Midgett also stated that Hyman had been drinking heavily. The solicitor admitted that "the five people who committed this act [were] intoxicated" and that the combination of "whiskey and firearms ... brought about the death" of the victim.

The trial judge noted the evidence of Hyman's intoxication. He instructed the jury that "voluntary intoxication is no reason or is no excuse for committing a crime." [2] But he added:

> Those offenses such as the offense of murder and armed robbery in which there must be a specific intent, the Defendant's drunkenness, if shown by the evidence may be considered by you in determining whether the Defendant committed the offense with the intent to do so or whether he was present aiding, assisting others in the commission of the offense.

South Carolina law defines murder as "the killing of any person with malice aforethought, either express or implied." S.C.Code Ann. § 16–3–10. The trial judge charged:

[M]alice is implied, it's presumed from the willful, the deliberate, the intentional doing of an unlawful act without just cause or excuse.

> So, generally speaking, malice means the doing of a wrongful act, intentionally and without any justification or excuse. Now, even if all the facts has [sic] proven and is sufficient to raise a presumption of malice, this presumption would be rebuttable and it's for you on the Jury to determine from all of the evidence whether or not malice has been proven beyond a reasonable doubt. Malice is presumed or implied from the use of a deadly weapon. Where the circumstances relating to the death of the deceased are brought out in the evidence, the presumption of malice which is implied from the use of the deadly weapon vanishes and the burden is on the State to prove malice whenever a deadly weapon is used by evidence which satisfies you on the Jury beyond a reasonable doubt.

The solicitor told the jury that the element of malice could be presumed. In his closing argument at the guilt phase, he stated:

---

**1.** Griffis, however, could not be sure whether Hyman or Hinson was the gunman. He explained: "They had something over their face and they looked just alike. I couldn't tell one from the other."

**2.** The court's charge is appended to the district court's opinion, 606 F.Supp. at 1075.

Well, the law says that a person who uses a deadly weapon may be presumed to act with malice. It's not an absolute presumption, but the use of a deadly weapon, knife, a club, a gun, shotgun, rifle, pistol. Certainly a person who uses such a weapon on another person has evil in his heart. The law says that a person who intentionally commits an unlawful act acts with malice. So that a person who goes into a convenience store with a gun to rob has malice in his heart and when he kills the proprietor of that convenience store, he has committed murder because he has acted with malice. He walked into that store with malice and he killed with malice in his heart.

Also, the solicitor suggested that Hyman had shot Griffis after grabbing the shotgun from Allday. But he emphasized that Hyman should be convicted of Griffis's murder even if Hyman did not shoot him. The solicitor told the jury:

> It doesn't matter who pulled the trigger. It doesn't matter at all. In this case, it doesn't matter who pulled the trigger. All who were in the trailer with the intention to aid and assist the other in robbing these two old men are guilty. The hand of one is the hand of all.

The court also instructed the jury that "when two or more persons combine together to commit a crime and the crime is in fact committed, all of those present at the scene of the crime to aid and assist in its commission are equally guilty. The act of one ... becomes the act of all."

The jury's guilty verdict did not identify the actual killer.

During the sentencing proceedings Hyman testified: "I did not kill the man."

The solicitor presented no new evidence at the sentencing phase on the question of who killed Teagus Griffis, relying instead on the record from the guilt phase. But in his summation, the solicitor told the jury, "If you find that [Hyman] did not pull the trigger, you should not recommend the death penalty." The court, however, charged the jury that the state alleged two statutory aggravating circumstances: "One that the murder was committed while in the commission of an armed robbery. And two, that the murder was committed while in the commission of a burglary." The court also charged: "In the event that you unanimously find beyond a reasonable doubt that one or more of the alleged aggravating circumstances existed at the time the victim in this case was murdered, then you would be authorized to recommend that the death sentence be imposed on the Defendant."

Three hours into its deliberations, the jury's foreman inquired: "Do we have to prove that he did the actual killing?" In response, the court reiterated his instruction about accomplice guilt and South Carolina's system of weighing aggravating and mitigating circumstances in capital cases, telling them they could recommend a death sentence even if they found a mitigating circumstance so long as they also found an aggravating circumstance. He further instructed them that whether Hyman fired the gun was to be considered among the aggravating and mitigating circumstances.[3]

Within an hour the jury returned a verdict recommending a sentence of death. It found as a statutory aggravating circumstance "[t]hat murder was committed while

---

**3.** During the course of the judge's supplemental instruction, he told the jury:

> You may return a death sentence if there is a mitigating circumstance present if you find at least one of the aggravating circumstances ...
>
> I charged you earlier that a person who aids and assists another in the commission of an offense or who was present at the time and committed the offense, would be equally guilty because under the hand of one, the hand of all theory, a person who commits the offense in concert with others is guilty obviously and anyone who assists the person com-

mitting an offense is guilty. But you've passed the question of guilt or innocence. It would be proper for you to consider in matters of mitigation or aggravation obviously whether this Defendant used the weapon or whether he didn't; but I'm not going to get into the facts with you now and try to reach any decision or suggest any opinion I may have as to what your position should be so far as a recommendation of sentence because under our Constitution, I can't comment on the facts....

in the commission of armed robbery." The jury made no finding that Hyman killed, attempted to kill, or intended to kill the victim.

## II

The South Carolina Supreme Court affirmed Hyman's conviction and death sentence. *State v. Hyman*, 276 S.C. 559, 281 S.E.2d 209 (1981). Hyman's application for state postconviction relief was denied. His federal petition for a writ of habeas corpus was referred to a magistrate who recommended that Hyman be granted a writ on the ground that his trial jury was given an instruction which impermissibly shifted the burden of proof. Rejecting the magistrate's report, the district court denied the writ. *Hyman v. Aiken*, 606 F.Supp. 1046 (D.S.C.1985). On appeal, we concluded that Hyman was not entitled to a new trial with respect to guilt. We held that he had been sentenced to death in violation of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and must be resentenced. *Hyman v. Aiken*, 777 F.2d 938 (4th Cir.1985).

The attorney general of South Carolina filed a petition for certiorari, and Hyman filed a cross-petition. The Supreme Court granted both petitions and remanded for consideration in light of *Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), and *Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986). *Aiken v. Hyman*, —— U.S. ——, 106 S.Ct. 3327, 92 L.Ed.2d 734 (1986).

## III

The Supreme Court's remand requires us to reconsider in light of *Rose* our ruling that an erroneous jury instruction does not entitle Hyman to a new trial on the issue of guilt. In *Rose*, the Court held that a jury instruction which creates an unconstitutional presumption of malice should be scrutinized under a harmless error test. 106 S.Ct. at 3105.

The trial judge instructed the jury, in the charge quoted in Part I of this opinion, that malice is "presumed from the willful, the deliberate, the intentional doing of an un-

lawful act without justification or excuse" or from "the use of a deadly weapon." The court also noted that the presumption of malice could be rebutted and that the state must prove malice beyond a reasonable doubt.

■ The jury reasonably may have believed that the judge's instructions, taken as a whole, relieved the state of its affirmative burden to prove the element of malice. In *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Court held that a jury instruction which creates a presumption of malice that shifts the burden of proof on intent to the defendant is a denial of due process. 442 U.S. at 523–24, 99 S.Ct. at 2459. In *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), the Court held that a mandatory but rebuttable presumption of an element of the offense, while it may be less burdensome to the defendant than a conclusive presumption, "is no less unconstitutional." 471 U.S. at 317, 105 S.Ct. at 1973. *See also Sandstrom*, 442 U.S. at 524, 99 S.Ct. at 2459. In deciding whether an erroneous malice instruction was harmless error, *Rose* requires an examination of the record as a whole to determine whether the evidence of intent is so dispositive that the "'reviewing court can say beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption.'" 106 S.Ct. at 3109.

In *Thomas v. Kemp*, 800 F.2d 1024 (11th Cir.1986), the court ordered a new trial upon finding that *Sandstrom* error in the original trial could not be considered harmless under the standard of *Rose*. The court acknowledged that the defendant killed the victim and that there was clear evidence of the intent necessary to support a felony murder conviction. At trial, however, the defendant testified that during the commission of the crime he was under the influence of drugs. The trial court charged the jury that one is not criminally responsible for an act if one's mind was so impaired that it made the actor incapable of forming intent. But the court also instructed that there is a rebuttable presumption both that

a person is of sound mind and that a person of sound mind intends the consequences of his acts. 800 F.2d at 1026. The appeals court concluded that the trial judge's instructions unconstitutionally shifted the burden of proof and could not be considered harmless beyond a reasonable doubt.

 There is substantial and uncontradicted evidence of Hyman's intoxication at the time of the crime. The judge instructed that conviction depended upon a showing of intent and that Hyman's drunkenness may be considered in determining whether he intended to commit the offense. If the jury was not sure whether Hyman's intoxication made him incapable of intending the crime, it should have decided that issue in his favor. Under the trial court's presumed malice charges, the jury may reasonably have believed it should convict Hyman even if it was not convinced that he acted with intent to commit murder. The importance of the malice presumptions is emphasized by the solicitor's reliance on them in his closing argument, which is quoted in Part I. Based upon the record as a whole, we conclude that evidence of Hyman's intent was not so dispositive that we can say beyond a reasonable doubt that the jury found it unnecessary to rely on the presumption. Therefore, the instructions do not meet the harmless error standard of *Rose*, 106 S.Ct. at 3109. *See also Thomas v. Kemp*, 800 F.2d at 1026; *Merlo v. Bolden*, 801 F.2d 252, 257 (6th Cir.1986).

### IV

The Supreme Court also directed us to review the validity of Hyman's death sentence in light of *Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986). The Court's mandate reinforces the sound practice of reviewing all nonfrivolous claims of constitutional error in a capital case. *See Barefoot v. Estelle*, 463 U.S. 880, 888, 103 S.Ct. 3383, 3392, 77 L.Ed.2d 1090 (1983).

*Cabana* complements the Court's opinion in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). *Enmund* held that the eighth and fourteenth amendments prohibit the imposition of the death penalty on a participant in a robbery during which a murder is committed unless the participant killed, attempted to kill, or intended to kill. 458 U.S. at 798 and 801, 102 S.Ct. at 3377 and 3379. In *Cabana*, the Court explained that the eighth amendment requires that the *Enmund* finding result from "an adequate proceeding before some appropriate tribunal." 106 S.Ct. at 700. A trial judge, or an appellate court, as well as a jury, may make the *Enmund* finding. Hence, a reviewing court's search for the finding should not be limited to an examination of jury instructions: "Rather, the court must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made." 106 S.Ct. at 697.

On remand, Hyman questions whether the definitive statement of his culpability required by *Cabana* has been rendered by any forum. Moreover, he argues that the record has been so tainted by the ineffective performance of his trial counsel that it cannot support a reliable *Enmund* finding.

In reply, South Carolina argues that findings which satisfy *Enmund* were made, implicitly or explicitly, by Hyman's trial jury, the state supreme court, and a state collateral relief judge. The state points out that in *Cabana* the Court emphasized that findings of state courts should be accorded a presumption of correctness under 28 U.S.C. § 2254(d) and *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

We cannot accept the state's argument that the jury either explicitly or implicitly found that Hyman killed, attempted to kill, or intended to kill the victim of the robbery. The jury was not instructed to consider this issue. On the contrary, they were told that they could recommend death if the proof showed that the victim was murdered in the commission of a robbery, and that is the single aggravating factor that they reported. The charge to the jury and the jury's verdict do not satisfy *En-*

*mund*'s requirements for the imposition of the death sentence.

Contending that the South Carolina Supreme Court made the requisite *Enmund* finding, the state emphasizes this extract from the Court's opinion, 276 S.C. at 571, 281 S.E.2d at 215:

> The record clearly reflects appellant planned, prepared and committed a brutal crime for the purpose of obtaining money. The death penalty is proportionate to a crime of this nature and to the crime and defendant in this case.

There are several reasons why this appellate opinion cannot be deemed to supply presumptively correct *Enmund* findings. The evidence supports the finding that Hyman participated in planning, preparing, and committing a brutal robbery. The court, however, did not expressly address the issue whether Hyman killed, attempted to kill, or intended to kill the victim. This is understandable because the Court's opinion was written before *Enmund* was decided. The opinion can be read as justifying affirmance of the judgment on the basis of South Carolina's law that one who participates in an assault and robbery is equally responsible as the accomplice who actually killed the victim. In *Cabana,* the Court noted a similar deficiency in the state appellate court's decision and concluded that it did not adequately meet the *Enmund* criteria. *See* 106 S.Ct. 698–99.

*Cabana* cautions that when the question whether the accused killed, attempted to kill, or intended to kill involves an issue of credibility that cannot be determined accurately on a paper record, there might be no adequate basis for appellate fact finding. In this event, the federal habeas court should not invoke the presumption of correct fact finding of § 2254(d) and *Sumner,* 449 U.S. at 545–47, 101 S.Ct. at 768–69. *See* 106 S.Ct. 698 n. 5. This case presents

an appropriate occasion for heeding *Cabana*'s caution. Codefendants, who pled guilty and received prison sentences, blamed Hyman. The victim's brother also blamed Hyman, but he had given a statement to the police immediately after the crime that a woman had shot his brother. This statement was not disclosed at the trial. Another witness, pardoned for murder shortly before the trial, stated Hyman had admitted the crime, but evidence of his pardon was excluded. Hyman denied that he shot the victim. Uncertainty about which witnesses to credit is revealed by the jury's question after much deliberation, "Do we have to prove that he did the actual killing?" Told that they did not, they brought back a verdict that did not identify the killer.

The state also relies on findings made by the state postconviction judge:

> The evidence shows that the Applicant did intend the death of the victim. The record clearly reflects that Applicant planned, prepared for and committed a brutal crime for the purpose of obtaining money. *State v. Hyman,* supra. A shotgun and ammunition were taken to the scene by Applicant and his accomplices. Additionally, there was testimony at trial that Applicant was, in fact, the triggerman. Under the facts and circumstances of this case, Applicant cannot seriously contend that he did not intend or contemplate that life would be taken.[4]

Hyman's postconviction hearing suffers from the same deficiency as the state appellate opinion in several respects. Indeed, it cites the appellate opinion for the basis of its *Enmund* findings. Although Hyman testified, the witnesses who accused him did not testify in the postconviction hearing. The postconviction court necessarily relied on the trial record and the Supreme

---

4. Although *Cabana* notes that the prisoner exhausted state postconviction remedies, 106 S.Ct. at 694, it does not refer to these proceedings as a source of *Enmund* findings. Instead, the Court held that the court of appeals erred by not inquiring whether the necessary finding "had been made by the trial court or the state appellate court." 106 S.Ct. at 698. Nevertheless, the

Court states that a federal habeas court could in theory make the necessary finding, although the sounder course of action would be to require the state's judicial system to make the findings in the first instance. This suggests that since a federal habeas court could make the findings, the findings could also be made in state postconviction proceedings.

Court opinion to make essential credibility findings, a procedure, as we previously noted, that *Cabana* points out must be accepted with caution. *See* 106 S.Ct. at 698 n. 5. Moreover, the postconviction court's finding that "there was testimony at trial that [Hyman] was, in fact, the triggerman" falls far short of a finding that he was the triggerman. Because the state postconviction *Enmund* findings rest in large part on the record, they, like the appellate findings, cannot be accepted.

The district court's habeas corpus proceedings do not satisfy the essential *Enmund* criteria. They, too, rest in large part on the state records. The witnesses who accused Hyman did not testify in the federal evidentiary hearing. Consequently, the district court was not in a position to make the critical credibility findings mentioned in *Cabana*, 106 S.Ct. at 698 n. 5.

The presumption that facts have been correctly found by a state court is inapplicable when the proceedings were not adequate to afford a full and fair hearing. § 2254(d)(2) and (6). For reasons explained in Part V, we conclude that Hyman was ineffectively represented at his trial. Consequently, he was not afforded a full and fair hearing. This is an additional reason for declining to accept *Enmund* findings based on the trial record.

### V

The Supreme Court of South Carolina, on Hyman's direct appeal, and the state postconviction court held that Hyman's counsel were not ineffective. The federal magistrate held that Hyman's counsel were ineffective, but Hyman suffered no prejudice. The district court rejected the magistrate's findings and held that Hyman's counsel were not ineffective. In our initial opinion, we agreed with the magistrate and the district court that Hyman did not suffer prejudice at the guilt phase of the trial due to his counsel's inadequate representation. We noted that in view of our decision that the sentence of death was improperly imposed, Hyman's charge about the effect of his counsel's deficiencies at the sentencing proceedings was moot.

Hyman's present counsel do not challenge our previous ruling that Hyman did not prove prejudice at the guilt phase of the trial. They reiterate, however, that the inadequacies of Hyman's representation prejudiced him at the penalty phase and flawed the *Enmund* findings, which in every forum were based primarily on the trial record.

The Supreme Court admonished in *Cabana*, 106 S.Ct. at 697, that a federal habeas court must examine the entire course of the state proceedings to determine whether the *Enmund* criteria have been satisfied. The admonition requires us to examine the issue of the competency of Hyman's trial counsel. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court explained the components of a claim that counsel's defective representation requires reversal of a death sentence. First, the prisoner must prove that his counsel made errors so serious that he was deprived of the right to counsel guaranteed by the sixth amendment. Second, the errors must be serious enough to deprive the prisoner of a trial whose result is reliable. 466 U.S. at 687, 104 S.Ct. at 2064. Both components present mixed questions of law and fact, so the ultimate conclusion of a state or federal court that counsel was effective is not binding on the reviewing court. In contrast, findings of historical fact are subject to § 2254(d) and Federal Rule of Civil Procedure 52(a). *See* 466 U.S. at 698, 104 S.Ct. at 2070.

After his arrest, Hyman's family retained Demetrious Stratos, a member of the Charleston bar, to represent him. Stratos had stopped buying reporters and subscribing to advance sheets "some years" before Hyman's trial. He did not own a current copy of the South Carolina Code, which contained the state's death penalty statute.

On the day that the state notified Hyman of its intention to seek the death penalty, Hyman moved to have Stratos relieved as counsel. He explained to the court: "I just don't believe that Mr. Stratos is up to date on the law." The court denied Hyman's motion and appointed a second attorney,

Landon Louthian, to assist in Hyman's defense. Stratos continued to act as lead counsel, but at the state postconviction hearing he said, "I didn't go see [Hyman] for approximately two months after he got up and made the statement that he didn't want my services any more, that I didn't know anything, so I wasn't interested in talking to him.... I didn't feel that friendly toward him." The parties stipulated that jail records show that from July 9, the day Hyman asked for new counsel, until the end of his trial—more than three months later—Stratos visited him twice and Louthian once.

Stratos and Louthian advised Hyman to accept the state's offer of a life sentence in return for a plea of guilty to murder. Hyman told them he would not plead guilty because he had not killed Griffis, Allday had. His counsel explained to Hyman South Carolina's law of accomplice liability, "the hand of one is the hand of all," and warned him he could be found guilty of murder even if he had not done the actual killing. Indeed, throughout the trial, including the penalty phase, Hyman's counsel were of the impression that under the accomplice theory Hyman could be sentenced to death if the murder was committed in the commission of armed robbery, and they took no exception to the judge's charge to this effect. Counsel's view of the case is understandable but not excusable. They had read none of the Supreme Court's decisions about capital punishment. At the postconviction hearing, counsel said they were not familiar with the principles of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), in which Chief Justice Burger explained that "individualized consideration [is] a constitutional requirement in imposing the death sentence." 438 U.S. at 605, 98 S.Ct. at 2965 (plurality opinion). In a separate opinion, Justice White noted that "it has been extremely rare that the death penalty has been imposed upon those who were not found to have intended the death of the victim" and suggested that the imposition of the sentence in such circumstances is unconstitutional. 438 U.S. 624–28, 98 S.Ct. at 2973 (White, J., concurring).

Stratos testified that because there were "absolutely only two witnesses" to the shooting, his theory of the case was the word of Hyman and his wife against the word of Sue Allday. At her own trial, Doris Hyman testified that Allday admitted to killing Teagus Griffis. But Doris was not called as a witness at her husband's trial, and her lawyer states that he was never approached by either of Hyman's counsel about the possibility of obtaining her testimony.

Hyman's counsel did not try to interview James Coulston, who testified that Hyman had confessed to the crime and had asked him for an alibi. Stratos said at the postconviction hearing that, although he did not know in advance what Coulston would say on the stand, he doubted Coulston would be called. Louthian testified that had he known Coulston would testify he could have produced witnesses to impeach his character and veracity. Coulston was an important witness whose credibility was critical. Before he testified, the state successfully moved to bar any reference to Coulston's conviction for murder and pardon. The prosecutor argued that the conviction was too old to show moral turpitude and in any event "the pardon vitiates the conviction." The record discloses that although Coulston was paroled in 1970 he was not pardoned until June 1979, about three months after Hyman was arrested and a few months before his trial. Nevertheless, Hyman's counsel acquiesced in the state's motion to exclude evidence about the pardon. While cross-examining Coulston, Stratos evidently had second thoughts, for he asked the witness: "When did you get your pardon? I'm sorry, I'm terribly sorry. Judge can we dismiss the Jury just for a minute. I just found out some information I didn't know before." When the jury retired, Stratos apologized to the court but added that he had been informed that Coulston got his pardon "in June of this year" and that "for his testimony he received a pardon." Without offering any evidence to refute Stratos's proffer, the prosecutor denounced Stratos. The court reprimanded Stratos and sug-

gested that he deserved a short jail sentence. The court also said "there is no basis for altering my ruling." Stratos agreed. He asked the witness no further questions.

Neither Stratos nor Louthian cited authority at the time of the prosecutor's motion or later during cross-examination establishing that they were entitled to question the witness about his pardon to show bias or prejudice. After the court excluded evidence of the pardon, they did not even request an opportunity to examine Coulston in the absence of the jury. Evidence of any linkage between the pardon and Coulston's testimony was relevant to his credibility. *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). In *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), the Court said:

> The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

Even at the postconviction hearing, Hyman's trial counsel offered no coherent excuse for failing to present authority that would support cross-examination of Coulston about his pardon. One can reasonably draw the inference that they had no knowledge of *Giglio* or *Napue*.

Before the trial, Stratos visited Hyman's codefendants, Hinson, Midgett, and Allday. He did not discuss the crime but simply advised them to make no statements to police. He did not know that all three codefendants had already given police their statements. Neither counsel attempted to interview Collins Griffis, an eyewitness.

The solicitor had an "open file" policy, permitting inspection both prior to and during the trial. Before the defense rested, the court asked Stratos and Louthian if "each of you had the benefit of the Solicitor's entire file in this case." Each replied that he had, and Stratos indicated that "[i]n fact, I made a copy of the file."

At the postconviction hearing, Stratos admitted that the only documents he had from the solicitor's file were the statements of Hinson, Midgett, and Allday. The solicitor had made copies of this portion of the file and given them to Stratos. When asked if he had personally looked through the file to see if there was anything of use besides the three statements, Stratos said:

> At the time I got the file, I looked through it, but I don't at that time recall—I saw a statement the other day that was made by Hyman. It's a possibility that I even looked at it, but I looked through it this morning, and I'm almost positive that if I looked at it, I looked through the first or second pages and saw that he was telling untruths, so I didn't go on through with it. I don't see any—I'm sorry.

The statement made by Hyman to Charleston police, which Stratos referred to, was also part of the solicitor's file and was used by the state to impeach Hyman's testimony when he took the stand at the penalty phase of his trial. Louthian testified that had he known of the statement's existence it would have been useful to him in helping to prepare Hyman for cross-examination.

Both the state postconviction court and the district court found that Hyman was prepared by counsel to testify on his own behalf. The record, however, does not support the finding that Hyman was adequately prepared to take the stand at his sentencing proceeding. Louthian did not discuss the content of Hyman's testimony with him. Stratos said that he could not recall doing anything to prepare for the sentencing phase. He also stated that between the time Hyman was found guilty and the time he began questioning him at the sentencing phase, he had spoken to his client "[m]aybe ... for half a minute." Because counsel were unaware of—or in Stratos's case had stopped reading—Hyman's statement to police, neither they nor their client were ready for the solicitor's questions. The magistrate correctly concluded that "[c]ounsel failed to adequately prepare the defendant for or to insulate him from devastating cross-examination during the penalty phase which cast him in

a highly prejudicial light." His counsel made no effort to have him admit on direct examination that his statement to the police was false.

Perhaps the most significant item in the solicitor's file was a police incident report recounting that Collins Griffis told investigating officers three hours after the crime that a woman shot his brother. Griffis was the only disinterested eyewitness to the crime, as well as the one who claimed to have seen the fatal shot fired. His statement to the police was inconsistent with his testimony that a man shot his brother. The report noted:

That he and his brother were watching T.V., and it was just when Hee Haw Honeys was going off, when a woman came to the trailer and wanted some help because she had a flat tire. He told his brother not to open it up because some gangsters are around here. He stated: He tried to get his brother not to open the door, but his brother did it anyway. As soon as his brother did, there was a blast and his brother stiffened out and fell backward ... on the floor. Then the next thing he knew there was a flash and something hit his face. He layed there until they left and then went to Mr. Brown's house for help.

By further talking with subject, he also stated: That one of the women grabbed his brother's shotgun that was by the door and she shot his brother with his own shotgun.

The investigating officer evidently credited Collins's statement. The solicitor's file contained a police report to the FBI which stated that "Teagus Griffis opened the door, at which time he was shot and killed by a shotgun blast."

Louthian undertook to cross examine Collins Griffis. At the postconviction hearing, Louthian testified he did not remember ever seeing Griffis's statement that a woman shot his brother but said that it could have been useful "because it was Mr. Hyman's contention all along that he didn't shoot [Teagus Griffis], that he thought Sue Allday had done it." Stratos claimed he read the statement but thought it would not be useful because he doubted Griffis's competency. There is no evidence that he discussed the statement with Louthian. At trial counsel neither objected that Collins was incompetent to testify nor sought to impeach his testimony by his statement.

It is doubtful that in 1979 the statement could have been introduced as substantive evidence, for South Carolina did not recognize this function of a witness's prior inconsistent statement until three years later. *See State v. Copeland,* 278 S.C. 572, 581–82, 300 S.E.2d 63, 68–69 (1982). The testimony of the officer who took Griffis's statement, however, could have been used to impeach him. *Copeland,* 572 S.C. at 581–82, 300 S.E.2d 68–69.

After the jury returned its verdict, the court informed counsel that the statute entitled the defense to a 24–hour waiting period before the commencement of the sentencing proceeding. Stratos had not yet read the death penalty statute, which lists aggravating and mitigating circumstances to a capital crime. Nevertheless, he told the court: "Let the record show that the two attorneys for Mr. Hyman waive [the waiting period]. However, Mr. Hyman does not waive it."

Louthian said he had reviewed the statute but "didn't know a whole lot of background on anything other than just to refresh my memory on what constituted Murder and Housebreaking and Armed Robbery and those things." Neither Stratos nor Louthian read any South Carolina or federal death penalty cases in preparation for trial.

At the state postconviction hearing, five lawyers who qualified as expert witnesses offered their opinion of the effectiveness of Hyman's counsel. After reviewing the transcript, each concluded that Hyman did not receive the representation to which he was constitutionally entitled. When presented with a list of counsel's alleged errors which were not clear on the face of the transcript—such as the failure to read the solicitor's file—the witnesses again concluded that Hyman's attorneys had not been effective. The witnesses were de Rosset Myers, a trial lawyer with 40 years'

experience, a former president of the South Carolina Bar Association, and a former state circuit judge appointed by the Supreme Court of South Carolina for a special term; Gaston Fairey, a former public defender, who teaches a seminar on the death penalty for the National College of Criminal Defense; George D. Bowling, who had served in the Charleston County defender's office; Arthur Howe, a former assistant United States attorney and circuit solicitor; and David Bruck, a private practitioner who supervises death penalty litigation for South Carolina's office of appellate defense. All of these witnesses pointed out specific instances of ineffective representation by Hyman's counsel, criticizing their lack of preparation, ignorance of the law, and inadequate performance during the trial. In addition, Capers Barr, the solicitor who prosecuted Hyman, testified that of the six capital cases he has tried under the new statute, he would rank the performance of Hyman's counsel as the lowest "in terms of their preparation and presentation of the case."

Hyman's claim that he was denied effective assistance of counsel during the penalty phase of his trial must be evaluated against the two-part test announced in *Strickland*. First, Hyman has to show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. at 2064. Second, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068. *See Darden v. Wainwright*, 477 U.S. 187, 106 S.Ct. 2464, 2473, 91 L.Ed.2d 144 (1986).

Under the first half of the *Strickland* test, counsel enjoys the benefit of a strong presumption that the alleged errors were actually part of a sound trial strategy and that counsel's performance was within the limits of reasonable professional assistance. 466 U.S. at 689, 104 S.Ct. at 2065. But this presumption does not overcome the failure of Hyman's attorneys to do basic legal research, to review the testimony of key witnesses—including their own client—and to be familiar with readily

available documents necessary to an understanding of their client's case. Counsel's lack of preparation and research cannot be considered the result of deliberate, informed trial strategy. Their performance was based on ignorance rather than on understanding of the facts and the law. We conclude counsel's performance to be below the objective standard of reasonable representation required by *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065.

We also conclude that but for his counsel's unprofessional errors, there is a reasonable probability that the outcome of the sentencing phase of Hyman's trial would have been different. In *Strickland*, the Court pointed out that a test for prejudice "finds its roots in the test for the materiality of exculpatory information not disclosed to the defense by the prosecution." 466 U.S. at 694, 104 S.Ct. at 2068. Certainly prejudice would be apparent if the prosecutor had withheld Collins Griffis's inconsistent statement or the fact of Coulston's pardon. *See, e.g., Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The failure of Hyman's counsel to examine and to appreciate what the solicitor made readily available to them was equally prejudicial. These incidents, coupled with counsel's failure to read other statements in the solicitor's file and their failure to adequately prepare for sentencing with respect to both facts and law, clearly establish prejudice within the meaning of *Strickland*, 466 U.S. at 687, 691–96, 104 S.Ct. at 2064, 2066–69.

Because Hyman's counsel were ineffective, the trial record is an inadequate basis for the imposition of the death penalty by the jury, trial, appellate, or postconviction courts. Reliance on a state court record tainted by ineffective assistance of counsel would be troubling in any case. But in a capital case, where there is a greater need for accurate fact finding, such reliance is unacceptable. Recently the Supreme Court reiterated that "[i]n capital proceedings generally this Court has demanded that

factfinding procedures aspire to a heightened standard of reliability." *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 2603, 91 L.Ed.2d 335 (1986) (plurality opinion).

## VI

Hyman insists that South Carolina law requires that only a jury can make the *Enmund* findings. He relies on *State v. Peterson*, 287 S.C. 244, 248, 335 S.E.2d 800, 802 (1985), where the Supreme Court of South Carolina directed trial courts to instruct the jury on the *Enmund* criteria.

We decline to restrict the state court proceedings. *Peterson* explains how a jury must be instructed, but it does not provide that only a jury can impose a death sentence. The state courts may designate the appropriate forum for this function. *See Cabana*, 106 S.Ct. at 699–700. Regardless of the forum, such a hearing would have to comply with South Carolina's death penalty statute, S.C.Code § 16–3–20(C), and the sixth, eighth, and fourteenth amendments.

## VII

While this appeal was under consideration, the Supreme Court decided *Tison v. Arizona*, — U.S. —, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), which supplements the principles explained in *Enmund*. The Court held that "major participation in the felony committed, combined with reckless indifference to human life is sufficient to satisfy the *Enmund* culpability requirement." The Court observed that Arizona courts had found that the accused was a major participant in the felony. It vacated the judgment and remanded the case for determination of whether the accused acted with reckless indifference to human life.

Following the precedent established by the Supreme Court, we conclude that it would be inappropriate for us at this stage of the proceedings to decide whether the culpability explained in *Tison* applies to Hyman. This issue can best be determined when Hyman is retried.

## VIII

For reasons stated in Parts I, II, and III, we reverse the judgment of the district court and remand the case with directions to grant Hyman a writ of habeas corpus, unless the state retries him within a reasonable time.

RUSSELL, Circuit Judge, concurring in part, and dissenting in part:

I concur in all of the parts of the opinion except Parts IV, V, VI and VII, though as an abstract proposition, I agree with the reasoning in Parts VI and VII. I do not think that we are called upon to address the points discussed in these sections, since we had already found ample grounds to reverse and were reversing the judgment. It is suggested in the opinion that since this was a death case we should review and resolve all claims whether they be necessary or not to the decision and whether they are likely to arise on retrial or not. There is language in some of the decisions suggesting that the appellate court should review all claims raised by the appellant before affirming death sentences, but I do not read these decisions as requiring decision on points not necessary to the decision if the decision already is to reverse the death conviction. As I have said, I dissent from Parts IV, V, VI and VII of the opinion as set forth therein.

I am authorized by Judge WIDENER to state that he concurs in the above.