**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 10-1**

─────────────

JERRY TERRELL JACKSON,

　　　　　　Petitioner - Appellee,

　　　v.

LORETTA K. KELLY, Warden, Sussex I State Prison,

　　　　　　Respondent - Appellant.

─────────────

**No. 10-3**

─────────────

JERRY TERRELL JACKSON,

　　　　　　Petitioner - Appellant,

　　　v.

LORETTA K. KELLY, Warden, Sussex I State Prison,

　　　　　　Respondent - Appellee.

─────────────

Appeals from the United States District Court for the Eastern
District of Virginia, at Alexandria.　Leonie M. Brinkema,
District Judge. (1:06-cv-01097-LMB-TCB)

─────────────

Argued: January 26, 2011　　　　Decided: April 25, 2011

─────────────

Before DUNCAN, DAVIS, and WYNN, Circuit Judges.

─────────────

Reversed by published opinion.  Judge Duncan wrote the opinion, in which Judge Davis and Judge Wynn joined.

———————————

**ARGUED:** Matthew P. Dullaghan, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Loretta K. Kelly, Warden, Sussex I State Prison.  Michele Jill Brace, Washington, D.C., for Jerry Terrell Jackson.  **ON BRIEF:** Kenneth T. Cuccinelli, II, Attorney General of Virginia, Richmond, Virginia, for Loretta K. Kelly, Warden, Sussex I State Prison.  Philip E. Holladay, Jr., Taryn Koball, KING & SPALDING LLP, Atlanta, Georgia, for Jerry Terrell Jackson.

———————————

DUNCAN, Circuit Judge:

In the fall of 2002, a jury found petitioner Jerry Jackson guilty of breaking into 88-year-old Ruth Phillips's home, raping her, and smothering her to death with a pillow from her bed. Jackson was sentenced to death. Jackson's direct and collateral appeals were denied by the Supreme Court of Virginia. Jackson sought federal habeas relief, which the district court granted as to his penalty-phase claims following an evidentiary hearing.

The government appealed, urging that the district court abused its discretion by holding the evidentiary hearing and that relief was erroneously granted on Jackson's claims that counsel's development and presentation of mitigation evidence, as well as his failure to object to alleged instructional error, were constitutionally deficient. Jackson has cross-appealed, asserting additional claims arising out of alleged instructional error.

We assess the merits of Jackson's petition under the deferential standards spelled out in Strickland v. Washington, 466 U.S. 668 (1984), and the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254 ("AEDPA"). Our review is informed by the Supreme Court's recent guidance in Cullen v. Pinholster, No. 09-1088, 2011 WL1225705 (U.S. April 4, 2011). For the reasons described below, we conclude that, based on the

record available to the state court that adjudicated Jackson's claims on the merits, the writ was improvidently granted.

I.

A.

On Sunday, August 26, 2001, 88-year-old Ruth Phillips did not show up to church. Jackson v. Commonwealth, 590 S.E.2d 520, 524 (Va. 2004) ("Jackson I"). Concerned by her absence, Mrs. Phillips's son tried reaching her by telephone. Id. When there was no answer, he went to her Williamsburg, Virginia, apartment to check on her. Id. After letting himself in, he found his mother's body "lying 'twisted and exposed' on a bed in her bedroom." Id. As he later described it, her "leg was twisted around, and her pubic region was exposed[; h]er breast was exposed[; and h]er nightgown was up around her neck." Id. (alterations in original).

Mrs. Phillips's autopsy showed that she had died of asphyxia, which "occurs when the brain is without a supply of oxygen for four to six minutes." Id. The autopsy also found a bruise on her nose and lacerations on the exterior and interior of her vagina. Id. A crime scene investigator recovered a hair from Mrs. Phillips's chest and another from the bed underneath her stomach; more hairs were found in the vicinity of her left thigh. Id. Forensic analysis revealed that several of the

4

hairs were pubic hair that was inconsistent with samples taken from Mrs. Phillips.  Id.  These hairs were later found "to be consistent with [Jackson's] mtDNA to the exclusion of 99.998% of the population with a 95% degree of confidence."  Jackson v. Warden of the Sussex I State Prison, 627 S.E.2d 776, 783 (Va. 2006) ("Jackson II").

In December 2001, investigators conducted a videotaped interview with Jackson.  Jackson I, 590 S.E.2d at 524.  After waiving his Miranda rights, he "admitted entering Mrs. Phillips' apartment, searching through and taking money out of her purse." Id.  Jackson claimed he did not know Mrs. Phillips was home when he flipped on the light and began to sift through her purse. Id.  As a result, he was "scared" when Mrs. Phillips, who had been lying in bed, exclaimed: "What do you want? I'll give you whatever, just get out."  Id.

Jackson acknowledged that when he realized Mrs. Phillips had seen him, "he held a pillow over her face for two or three minutes and tried to make her 'pass out' so she could not identify him" and further "admitted that he inserted his penis into her vagina while he was holding the pillow over her face." Id. at 524-25.  Jackson added that after exiting through a back window, he drove away in Mrs. Phillips's car, which he ultimately abandoned.  Id. at 524-25.  He also reported that he used the sixty dollars he stole from Mrs. Phillips's purse to

5

buy marijuana.  Id. at 525.  Jackson repeatedly insisted that he had not intended to kill Mrs. Phillips.  Id.

A Virginia grand jury indicted Jackson in March 2002 and charged him, inter alia, with two counts of capital murder for the premeditated killing of Phillips in the commission of rape or attempted rape and in the commission of robbery or attempted robbery.  Id. at 523.

Jackson's trial was bifurcated into a guilt and a penalty phase.  During the guilt phase, Jackson retreated from his earlier statement to law enforcement, testifying that he had confessed to investigators because he believed "that was what [they] wanted to hear" and that an accomplice had in fact smothered Phillips.  Id. at 525.  Jackson further "denied having any knowledge about who raped Mrs. Phillips or about how his pubic hairs got on her body."  Id.

The jury found Jackson guilty of both capital counts and of various other state crimes.  Id. at 523.  Following penalty-phase proceedings--which we discuss in greater detail below--the jury found a "probability that [Jackson] would commit criminal acts of violence that would constitute a continuing threat to society" and recommended a death sentence on both capital counts.  J.A. 983-85.  In April 2003 the state circuit court accepted the jury's recommendation and imposed a death sentence.

Jackson appealed his convictions. The Supreme Court of

Virginia affirmed in January 2004. See Jackson I, 90 S.E.2d at 520. The United States Supreme Court declined review. Jackson v. Virginia, 543 U.S. 891 (2004).

B.

On December 3, 2004, Jackson "filed an oversized habeas petition with the [Supreme Court of Virginia] along with a motion for leave to exceed the court's 50-page limit." J.A. 2384. The Supreme Court of Virginia denied the motion for extra pages and directed Jackson to file a "corrected petition." Id. at 1140. Jackson filed an amended petition on January 4, 2005, alleging fourteen distinct claims of constitutional error.

The Supreme Court of Virginia rejected each of Jackson's habeas arguments and denied his petition on its merits on March 24, 2006. See Jackson II, 627 S.E.2d at 780. We briefly review the state court's analysis of Jackson's claims at issue in this appeal: (1) that defense counsel[1] provided constitutionally deficient representation by failing to interview Jackson's siblings and by failing to present evidence of Jackson's

---

[1] Jackson was represented at trial by two attorneys, Patrick Kelley and Andrew A. Protogyrou. Jackson v. Kelly, 699 F. Supp. 2d 838, 843 n.6 (E.D. Va. 2010) ("Jackson III"). All references to defense counsel with respect to the penalty phase of Jackson's trial are to Protogyrou, who was responsible for that portion of the trial.

7

positive traits;[2] and (2) that the participation of two jurors who indicated they would not consider certain mitigating factors unless instructed to do so--coupled with the absence of a specific mitigation instruction--constituted constitutional error on the part of the prosecutor, defense counsel, and the trial court.

The Supreme Court of Virginia rejected Jackson's argument that counsel's failure to interview his brother and sister, Damien and Chandal Jackson, constituted ineffective assistance of counsel.  The court reasoned that Jackson's claim did not satisfy the "prejudice" prong of the Supreme Court's two-part Strickland test for constitutionally deficient representation. Jackson II, 627 S.E.2d at 786 (citing Strickland, 466 U.S. at 687).  It did not address whether his claim satisfied the first prong of the test, i.e., whether "counsel's representation fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688; see also McHone v. Polk, 392 F.3d 691, 704 (4th Cir. 2004) (noting that when a defendant "fails to demonstrate sufficient prejudice from certain acts or omissions" a court

---

[2] As part of his claim that counsel's development and presentation of mitigation evidence was constitutionally deficient, Jackson's state-court habeas petition also asserted that counsel failed to present expert evidence about the impact of childhood abuse on development.  The Supreme Court of Virginia did not explicitly address this point, which Jackson again raised in his federal habeas petition.

"need not decide whether counsel's performance in those respects was, in fact, deficient under Strickland").

The court anchored its determination in two related findings. First, it concluded that counsel had presented ample mitigation evidence in the form of seventeen mitigation witnesses. The court noted that the jury had heard "the testimony of physicians, psychologists, social workers, and a pastor who had treated, evaluated, and/or counseled [Jackson] and his family, to substantiate that [he] was the victim of child abuse."[3]  Jackson II, 627 S.E.2d at 786.  The court also

---

[3] The court discussed this testimony in detail, noting that it

> included information that petitioner's stepfather received a suspended jail sentence for physically abusing petitioner; hospital and doctor's office records indicating petitioner had been physically disciplined with a belt resulting in lasting bruises; records that petitioner had suffered various fractures of unknown origin to his extremities; that petitioner often appeared bruised; that reports of abuse were made to the James City County Department of Social Services and that twice the abuse was determined to be "founded;" that petitioner was allowed to drink beer as a young child; that petitioner and his stepfather had a bad relationship and that, even during counseling, petitioner's stepfather constantly berated petitioner by calling petitioner "evil;" that petitioner's "problems were compounded by the weakness of [his] parental subsystem" and lack of "material resources" which required petitioner to be left unsupervised; that petitioner's family did not follow through with counseling or recommendations; and that on at least one occasion, petitioner had been sexually abused.

(Continued)

9

cited counsel's elicitation of testimony from "the police officer who investigated the charges of child abuse against petitioner's stepfather and from several of petitioner's neighbors, friends, and family members, including his mother, father, and stepfather." Id. at 786-87. In light of this mitigating evidence of Jackson's traumatic childhood, the court deemed the testimony that would have been offered by Jackson's siblings "largely cumulative,"[4] reasoning that it amounted to mere "anecdotal evidence of specific instances of the abuse from the perspective of [the] siblings." Id. at 787.

As a second, related basis for its holding, the court found that talking to Jackson's siblings would not have altered counsel's trial strategy. The court cited counsel's "strategic decision not to call . . . Damien [] to testify because Damien's successful transition from the abusive environment into a military career would have diminished the mitigating effect of [Jackson's] abusive upbringing." Id. Observing that counsel was aware of Jackson's abusive background when he opted not to

Jackson II, 627 S.E.2d at 786.

[4] Jackson's habeas petition included an eight-page affidavit from Damien Jackson and a five-page affidavit from Chandal Jackson, which detailed the testimony they would have offered at trial.

10

have Damien testify, the court found no suggestion in the record that counsel's strategy "would have been altered by knowing the specific details of the abuse." Id. As a result, the court held that Jackson had "failed to demonstrate . . . a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different." Id. (citing Strickland, 466 U.S. at 687, 694).

The state court also rejected Jackson's claim that counsel "had failed to adequately investigate and present available mitigation evidence concerning [Jackson's] good character," holding that it satisfied neither prong of the Strickland analysis. Id. With regard to counsel's performance, the court found that the record of the penalty-phase proceedings "demonstrate[d] that the jury heard evidence of petitioner's good qualities, including evidence that petitioner was well-mannered and cooperative, followed directions, was motivated and ambitious, and had positive relationships outside of his immediate family environment." Id. As for the second prong, the court noted that Jackson had not shown that "additional evidence of his good character, such as his love for his grandmother and his desire that his parents reunite, would have affected the jury's determination," and, as a result, could not demonstrate prejudice. Id.

The Supreme Court of Virginia further held that Jackson's claims arising out of alleged instructional error lacked merit. It first rejected Jackson's argument that two jurors were not qualified for service because they "indicated that they would not consider age and background as mitigation evidence unless the trial court instructed them to do so" and were not specifically given such an instruction.[5]  Id.  The court found the claim procedurally defaulted, as Jackson had not raised it at trial or on direct appeal.  Id.  Jackson's related argument that the government's failure to request an instruction that emphasized age and background as mitigation evidence amounted to prosecutorial misconduct was also deemed defaulted.  Id. at 788.

The Supreme Court of Virginia denied on its merits Jackson's non-defaulted argument that his counsel's failure to request an age-and-background instruction constituted ineffective assistance of counsel.  Id. at 787.  In doing so, the court explicitly rejected Jackson's underlying assertion that both jurors' qualification had been "conditioned" upon the delivery of a particular instruction.  Id. at 787.  To the contrary, the court explained, "[b]oth jurors were qualified upon the trial court's determination that they would be fair and

_____

[5] We provide additional detail on the jurors' statements below in the context of our discussion of Jackson's claims of alleged instructional error.

12

impartial." Id. As a result, the court reasoned, the failure to request an instruction could not have been prejudicial. Id.

The state court cited additional reasons why Jackson's claim satisfied neither prong of the Strickland analysis. It observed that a request by defense counsel for a particularized instruction "would have been properly refused" under Virginia law. Id. at 788 (citing George v. Commonwealth, 411 S.E.2d 12, 23 (Va. 1991); LeVasseur v. Commonwealth, 304 S.E.2d 644, 661 (Va. 1983)). Consequently, the court reasoned, counsel's omission was not unreasonable. Id. The court further noted that "the jury was instructed to consider petitioner's history, background, and mitigating factors," in the context of its assessment of "whether petitioner posed a future danger to society." Id. (emphasis added).

Having rejected these arguments, along with Jackson's other habeas claims, the Supreme Court of Virginia denied his petition for relief. The United States Supreme Court again denied certiorari in January 2007. Jackson v. Kelly, 549 U.S. 1122 (2007).

C.

The federal district court for the Eastern District of Virginia granted Jackson a stay of execution in September 2006, and appointed habeas counsel in early December of that year. On December 11, 2006, Jackson moved for an extension of the

13

deadline for his federal habeas petition, to a date "not later than April 17, 2007." J.A. 1310. Jackson asserted that April 17 was when the statutory one-year limitation period--which had been tolled by his filing of his state habeas petition on December 3, 2004--would expire. See 28 U.S.C. § 2244(d)(1)-(2).

The court granted an extension to March 16, 2007, explaining that it did not count the tolling period from December 3, 2004, but instead from January 4, 2005--the date that Jackson filed his amended petition. The court noted that the Supreme Court of Virginia's habeas decision had identified January 4 as the date Jackson's petition was filed. On December 18, 2006, Jackson filed a "Notice," asserting once again that the tolling period should be counted from December 3, 2004. Jackson provided his "Notice" to the government, but the government did not respond.

Three days later, on December 21, 2006, the government filed a motion for reconsideration of the extension to March 16, urging that no extension was warranted. The government made no mention of Jackson's "Notice" nor did it otherwise address the tolling period. The court denied the government's motion for reconsideration on January 19, 2007, reaffirming that Jackson had until March 16 to file his petition.

On March 8, 2007, Jackson filed a second motion to extend the deadline to April 17. Again, the government opted not to

14

respond. The district court granted the motion the next day, concluding that Jackson's calculation, which treated December 3, 2004, as the date his state habeas petition was filed, reflected "a correct statement of the law." J.A. 1356. On April 17, 2007, Jackson filed his petition for federal habeas relief.

Jackson's petition included a request for an evidentiary hearing, which the court granted on February 28, 2008. The court's initial order did not specify why the request had been granted but stated generally that Jackson's mitigation claim "ha[d] not been adequately developed in the record." Id. at 1516. In response to a government motion to reconsider the evidentiary hearing, the court clarified that the proceeding was warranted because Jackson's filings "alleged sufficient facts that, if fully established, would entitle him to relief on two of the 17 claims raised in his federal habeas petition." Id. at 1527–28.

The court held the evidentiary hearing on April 30 and May 1, 2008. Nine witnesses testified, including Jackson's siblings and the two attorneys who had represented Jackson at trial. On August 14, 2008, the court denied Jackson relief as to the guilt phase of his trial.

Some eighteen months later, on March 29, 2010, the court granted Jackson relief as to the penalty phase, finding that counsel rendered ineffective assistance by failing to

15

investigate and argue key mitigation evidence and by failing to challenge the lack of a jury instruction on age and background. See Jackson v. Kelly, 699 F. Supp. 2d 838 (E.D. Va. 2010) ("Jackson III"). The court recognized "the extremely deferential standards for collateral review of a state court judgment" but concluded that the Supreme Court of Virginia had erred by denying relief. Id. at 843. We review the court's lengthy analysis, which is the subject of both the government's appeal and Jackson's cross-appeal. In light of Cullen's admonition that our review is limited "to the record that was before the state court that adjudicated the claim on the merits," 2011 WL 1225705, at *8, we avoid discussion of the evidence taken in the federal evidentiary hearing.

1.

The district court first assessed Jackson's claims that his counsel had provided ineffective assistance at the penalty phase by failing to (1) interview Jackson's siblings, (2) present scientific evidence linking childhood abuse to adult behavior, or (3) present evidence of Jackson's positive traits.

The court began with counsel's failure to interview Jackson's brother and sister. As the Supreme Court of Virginia had not addressed whether counsel's omission satisfied the ineffectiveness prong of the Strickland analysis, the district

16

court assessed that portion of his claim de novo. Id. at 844 (citing Porter v. McCollum, 130 S. Ct. 447, 452 (2009)).

The court discussed counsel's efforts to develop mitigation evidence related to Jackson's abusive upbringing. The court noted that counsel had pursued that goal by "assembl[ing] a collection of Jackson's medical, social, and educational records, which contained references to numerous instances of abuse." Id. It further observed that counsel had interviewed Jackson, as well as his mother, father, stepfather, godmother, uncle, cousin, and pastor. Id. at 847-48 & n.13.

While recognizing the steps that counsel had taken, the court held that additional research had been warranted. The court rested its conclusion on the contents of the records counsel had assembled, which it discussed in some detail.[6] Id.

---

[6] The court summarized the records that it concluded "should have prompted further investigation" as follows (all citations are to the joint appendix that was before the district court):

> [A] report generated after a particularly severe beating by Tim Knight [Jackson's stepfather], when Jackson was twelve years old, notes, "There is a previous history of abuse by [redacted] and this incident appears to be much more severe. In addition, neither of the victims reported the abuse; Jerry's injuries were discovered by accident and he was reluctant to cooperate with the investigation." Id. at 539. The "planned, calculated" nature of that incident also leads to the conclusion that more abuse was occurring: "Both boys indicated that [redacted] made them strip naked and exercise so that they would

(Continued)

17

be too tired to run from him during their punishment; [redacted] then beat both of them with his belt while they were naked." Id. at 625, 538. Another report of the same incident states: "This is the 3rd incident of known physical abuse of Jerry by Mr. Knight and the 1st resulted in maiming charges," Id. at 625 (emphasis in original), and estimating "the likelihood of reoccurance [sic][is] high. The children did not report the abuse, & Jerry was afraid to cooperate w/ DSS. They appeared to accept their parents' decision that they deserved the beatings." Id. Another report contains a passing reference to a beating with a two-by-four. Id. at 617. A report made when Jackson was nine years old states, "Worker asked if similar incidents had occurred & he stated that about two weeks earlier he had gotten his [redacted]." Id. at 670. A social worker later wrote of Jackson, then age thirteen, "I get the impression that Jerry has been physically beaten by all the adults in his life, starting with his natural father." Id. at 533. Another record notes that Jackson's mother and stepfather "seem[ed] to be confused about how to handle Jerry, since the Court has mandated that Tim cannot use physical punishment." Id. at 2727. The records also contain indications of serious neglect at an early age, which should have been explored further. See, e.g., id. at 652 (A police report from 1988, when Jackson was seven years old, states "neighbors called the police when they found 2 children huddled in the stairwell--not the first time .... [redacted] locked them out of the apt."); id. at 2729 (referring to Jackson's "weak parental subsystem"); id. at 2677-79 (referring to "lack of parental attention"); id. at 2769 (referring to Jackson feeling "loss and abandonment").

The records in counsel's possession also contained leads to other types of mitigation evidence. One report, for instance, contains a reference to Jackson "drinking alcohol" at age twelve, id. at 619, another to an allegation of sexual abuse by a relative, id., and another to an unexplored allegation that Jackson, at age seven, had been "outright raped" by a visitor at his grandmother's house. Id. at 2799-2800. These

(Continued)

at 846-47. In doing so, it identified numerous reports documenting severe abuse and neglect, as well as allegations of sexual abuse. Id. at 846-47.

The court emphasized, moreover, that the records' troubling contents reflected only "incomplete, limited snapshots of Jackson's childhood, documenting only four or five instances of abuse and providing mental health assessments from a few isolated time periods." Id. at 846. Faced with these glimpses into Jackson's background, the court reasoned, "a reasonable attorney would have realized that a thorough investigation into Jackson's home life was essential." Id. at 847. In this regard, the court noted, Jackson's parents were unreliable sources of information, as Jackson's father and stepfather had

> pieces of information, together with Jackson's report to his attorney (reflected in counsel's notes) that someone forced Jackson and his brother to masturbate in front of them, Tr. at 237 ("Made him + brother masturbate in front of him."), that he was "molested for years", id. at 236, and that his brother was raped by an uncle while Jackson hid in the closet fearing he would be raped next, id. at 357, indicate the likely existence of a wealth of mitigating evidence completely unexplored by trial counsel. Those records also document that Damien would have direct knowledge of the abuse because he was referenced in the reports as well.

Jackson III, 699 F. Supp. 2d at 846-47 (alterations in original and footnote omitted). The court also cited "passing references to diagnosable depression." Id. at 847.

19

been implicated in incidents of abuse, and his mother had at least tacitly "endorse[d]" it. Id. at 848.

Against this backdrop, the court held that counsel's decision not to speak to Jackson's siblings "was a critical and glaring omission." Id. at 849. The court observed that both siblings were older than Jackson and had lived in the same household as Jackson for significant stretches of his childhood. Id. at 849. As a result, the court found, both "were the only credible witnesses" regarding the incidents of abuse documented in the record. Id. In the court's view, "Damien or Chandal could have offered detail to the reported abuse, described the nature of Jackson's relationship with his father and stepfather, or indicated whether there were other unreported problems." Id.

The court rejected the notion that counsel's investigation reflected a "strategic choice" to avoid "the jury drawing unfavorable comparisons between Jackson and his siblings" for two reasons. Id. First, it found that "counsel did not rely on this 'strategy' at trial," citing instances on direct examination in which counsel "opened the door" to cross-examination about Damien, as well as counsel's own comparison of Jackson to his brother in closing argument. Id. at 849-50. Second, the court concluded that counsel could not have made a reasonable strategic choice without first speaking to Jackson's siblings to assess what testimony they could offer. Id. at 850.

20

The court next reviewed counsel's failure to present expert testimony to link Jackson's abusive childhood to his adult behavior. Id. at 851. The court observed that determining whether this omission constituted ineffective assistance was "difficult," as counsel's failure to "discover and present the crucial evidence of Jackson's abusive childhood" precluded his establishing "the basis for introducing scientific evidence linking the effects of such a childhood abuse to adult behavior." Id. Despite this obstacle, the court found, without further explanation, that "counsel's . . . failure to connect the dots between childhood abuse and adult behavior must be viewed as yet another instance of deficient performance under Strickland." Id. at 851-52.

The court then turned to Jackson's claim that counsel had failed to investigate and adduce evidence of his positive traits. The court rejected the Supreme Court of Virginia's factual conclusion that such evidence had been presented. Id. at 852. It explained that much of the evidence cited by the state court "consisted of hearsay statements recited by a psychologist who had never treated Jackson personally, but read from reports describing Jackson's demeanor during a counseling session when he was approximately twelve years old." Id. It also found that the state court had treated "isolated statements" by a prison guard and Jackson's mother as positive

21

character evidence. Id. (citing the guard's statement that he had not had problems with Jackson until a particular incident and Jackson's mother's testimony that she had been "able to communicate better and talk more" with Jackson while he was in prison).

The district court deemed the Supreme Court of Virginia's factual finding "an unreasonable determination of the facts in light of the evidence," id. (quoting 28 U.S.C. § 2254(d)(2)), reasoning that "[t]hese bland, hearsay comments offered no real insight into Jackson's character or personality," id. The court further found that Jackson had shown by "'clear and convincing evidence,' that no evidence of his positive traits was ever presented to the jury." Id. (quoting 28 U.S.C. § 2254(e)(1)). The court also rejected the possibility that the paucity of positive character evidence presented reflected the absence of such evidence or a strategy to avoid evidence "inconsistent with the defense's mitigation theme." Id. at 852-53.

Having concluded that counsel's performance was constitutionally deficient in the three respects described above, the court turned to the prejudice prong of the Strickland analysis. Id. at 854. To assess the impact of counsel's behavior on Jackson's sentence, the court reviewed the evidence presented at the penalty phase of his trial. See id. at 855.

22

The court first described the government's presentation, which it found consisted of testimony from Mrs. Phillips's son, two prison officers, and "a victim of a burglary Jackson committed the evening before Phillips was murdered." Id. The court observed that the government had introduced evidence of Jackson's "extensive" criminal history,[7] but noted that his record "consisted mostly of property crimes and contempt violations." Id. at 855. The court did not reference the evidence of Jackson's rape and murder that the government had presented to the jury in the penalty phase. See id.

The court then briefly reviewed the testimony of the seventeen witnesses defense counsel had called during the penalty phase. Id. at 855-57. These witnesses included: (1) an emergency room doctor who had examined Jackson when he was eleven; (2) a clinical psychologist whose associate had evaluated Jackson when he was eleven; (3) a records custodian from the Newport News Health Department; (4) a child psychologist who had evaluated Jackson when he was fourteen; (5) a pediatrician who had examined Jackson when he was fourteen;

---

[7] The government introduced "18 orders showing Jackson's convictions or adjudications of delinquency for such offenses as grand larceny, petit larceny, trespassing, drug possession, receiving stolen property, contempt of court, identity fraud, statutory burglary, credit card theft, and obtaining money under false pretenses." Jackson, 590 S.E.2d at 525.

23

(6) a records custodian from the New Horizon Family Counseling Center; (7) a clinical psychologist who had interviewed Jackson when he was fifteen; (8) a police officer who investigated an assault and battery on Jackson by his stepfather when Jackson was eleven; and (9) a social services official who had investigated multiple allegations of child abuse against Jackson. Id. at 855-57.

The district court also noted mitigating testimony from three individuals who had interacted with Jackson and his family when he was a child: (10) the family's pastor; (11) Jackson's neighbor and godmother; and (12) Jackson's cousin and godsister. Id. at 857. The court cited additional testimony from four members of Jackson's family: (13) Jackson's uncle; (14) Jackson's biological father; (15) Jackson's stepfather; and (16) Jackson's mother. Id. at 857-58. Jackson himself was the seventeenth and final mitigation witness. Id. at 858.

The court measured the testimony of these seventeen mitigation witnesses against the testimony elicited at the evidentiary hearing. See id. at 858-61. In light of its assessment of that material, the court flatly rejected the Supreme Court of Virginia's determination that the failure to interview Jackson's siblings did not satisfy Strickland's prejudice prong. See id. at 862. It noted that the Supreme Court of Virginia did not hold an evidentiary hearing and found

24

that the state court erred by deferring to "trial counsel's premature, uninformed 'strategic' choice."[8]  Id.

The court also rejected the Supreme Court of Virginia's determination "that the new evidence of abuse proffered by Jackson was cumulative."  Id.  The court emphasized that an assessment of prejudice arising out of counsel's performance during a capital case's penalty phase "is not a rote cataloging exercise" to "ensure[] that counsel presented some testimony on each potential area of mitigation."  Id. at 863.  Given its determination that the Supreme Court of Virginia's inquiry had amounted to such an exercise, the court found that the state court had unreasonably applied federal law by failing to consider "the 'entire evidentiary picture' presented to the jury."  Id. (quoting Strickland, 466 U.S. at 696).

In the district court's view, counsel's presentation amounted to "a parade of ineffective record witnesses,"

---

[8] The court reasoned in particular that the state court had mistakenly viewed as dispositive its determination that speaking with Jackson's siblings would not have altered counsel's strategy.  Id. (citing Jackson II, 626 S.E.2d at 786-87).  The court observed that, under the Supreme Court's standard articulated in Wiggins v. Smith, 539 U.S. 510 (2003), the pertinent "question is not whether, subjectively, Jackson's own counsel would have introduced the evidence," but instead "whether, objectively, 'a competent attorney, aware of this evidence, would have introduced it.'"  Id. (emphasis added) (quoting Wiggins, 539 U.S. at 535).  As a result, it deemed the state court's analysis "contrary to, and an unreasonable application of, Wiggins."  Id.

25

"contradictory testimony from character witnesses who reported little or no abuse," and "unchallenged testimony" from Jackson's abusers that his problems "were his own fault." Id. The court concluded that this evidentiary showing prejudiced Jackson, id. at 863-64, and that prejudice "was compounded" by the absence of testimony linking childhood trauma to psychological development, id. at 864. The court deemed it unnecessary to decide whether Jackson had shown independent prejudice arising out of the failure to present evidence of his positive traits, as that omission was prejudicial when viewed "in combination with" the failure to interview Jackson's siblings. Id. As a result, the court found habeas relief warranted on all three of Jackson's claims related to counsel's development and presentation of mitigation evidence.

2.

The court then addressed Jackson's assertion that counsel's failure to challenge the lack of a particularized mitigation instruction amounted to constitutionally deficient representation.[9] Id. at 864. The court recounted the colloquies

---

[9] We do not summarize the district court's analysis of Jackson's second claim of instructional error, which challenged counsel's failure to ask the district court to clarify for the jury that mitigation factors need not be unanimously found. Jackson has abandoned this argument, in light of the Supreme Court's decision that relief on this issue is foreclosed on (Continued)

26

of two jurors at voir dire, which it concluded showed that "[t]rial counsel and the trial court knew . . . that [these] jurors felt that neither age nor troubled background were mitigating factors." Id. at 865. The court found that, under these circumstances, the failure to specifically instruct the jury to consider age and background in mitigation "tr[od] on the guarantees of the Eighth Amendment." Id. In support of its conclusion, it cited the Supreme Court's admonition that although "[t]he sentencer . . . may determine the weight to be given relevant mitigating evidence," it "may not give it no weight by excluding such evidence from . . . consideration." Id. (quoting Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982)).

The court recognized that "failure to instruct a jury as to specific mitigating factors is generally not constitutional error." Id. at 866 (citing Buchanan v. Angelone, 522 U.S. 269, 278 (1998)). Nevertheless, it found that the "entire context in which the instructions were given," id. (quoting Buchanan, 522 U.S. at 278), suggested "a defect of constitutional proportion," id. The court cited three factors as creating a "context" in which a particularized instruction was mandated: the two jurors' responses during voir dire, the fact that Jackson was twenty

collateral review. See Appellee's Br. at 69 (citing Smith v. Spisak, 130 S. Ct. 676, 684 (2010)).

27

years old when he raped and murdered Mrs. Phillips, and the evidence of Jackson's abusive background presented during mitigation. Id.

The court rejected the Supreme Court of Virginia's conclusion that Jackson's claim of instructional error did not satisfy the first prong of the Strickland analysis. The court noted that the state court's finding that counsel's performance was reasonable relied on its conclusion that the trial court would have "properly refused" any request for a particularized instruction. Id. at 867 n.31 (quoting Jackson II, 627 S.E.2d at 787). The court found this assessment so unsupported by the record as to not merit AEDPA deference. Id. at 867 (citing Uttecht v. Brown, 551 U.S. 1, 20 (2007)). The court cited the trial court's statement that jurors would consider age "when they're told it's a factor" as indisputable evidence that the trial court appreciated "the need for a clarifying instruction," and would have provided one if asked to do so. Id. The court similarly rejected the Supreme Court of Virginia's determination that the future dangerousness instruction's charge to jurors to consider Jackson's history and background precluded a finding of prejudice on Strickland's second prong, finding the court's reasoning "contrary to" Supreme Court caselaw. Id. at 867-68. (citing Penry v. Lynaugh, 492 U.S. 302, 323-24 (1989)).

28

Having rejected the Supreme Court of Virginia's Strickland analysis, the court conducted its own assessment of whether counsel's failure to request a "proper instruction" constituted ineffective assistance of counsel. See id. at 866. On the first prong, the court held that counsel's behavior was objectively unreasonable, as counsel had conceded that his failure to challenge the instructions was not a strategic choice and counsel "was unquestionably aware" of at least one juror's need for a specific instruction. Id. at 866-67. With regard to the second prong, the court cited the "clear constitutional mandate that the jury consider age and troubled background" in mitigation, as well as "the specific voir dire in this case" as showing "a strong likelihood" that the trial court would have provided a specific mitigation instruction "had counsel only asked for it." Id. at 867. On the basis of these findings, the court found habeas relief warranted on this claim as well. Id.

In light of its determination that penalty-phase relief was appropriate on several of Jackson's claims, the district court vacated his death sentence. Id. at 870. In April of 2010 the government filed notice of appeal. Jackson filed notice of cross-appeal on May 3, 2010. On August 6, 2010, the district court denied Jackson a certificate of appealability, holding that he had not shown that Virginia courts' resolution of those claims "was debatable or wrong." J.A. 2510. We granted Jackson

29

a certificate of appealability for his cross-appeal claims on November 4, 2010.

### III.

Before turning to the substantive claims on appeal and cross-appeal, we address two procedural arguments made by the government: (1) that Jackson's federal habeas petition was barred by the statute of limitations and (2) that the district court abused its discretion by holding an evidentiary hearing.[10] We conclude that Jackson's federal habeas petition was not time barred, but that the district court erred by relying on evidence it obtained from its own hearing when assessing Jackson's mitigation-related Strickland claims, which had been adjudicated on their merits by the Supreme Court of Virginia.

### A.

The government argues that Jackson's federal habeas petition was time-barred, urging that the district court's grant of an extension to April 17, 2007 erroneously extended Jackson's filing deadline beyond the one-year statutory deadline. See 28 U.S.C. § 2244(d)(1). The government concedes that the statute

---

[10] Because we hold that the writ was improvidently granted, we bypass the government's argument that some of the claims on which the district court granted relief were procedurally defaulted.

30

of limitations is tolled during the period in "which a properly filed application for State post-conviction or other collateral review . . . is pending." Id. § 2244(d)(2). However, it urges that Jackson's oversized brief, which he submitted on December 3, 2004, did not constitute a "properly filed application." Counting from January 4, 2005, the date that Jackson's corrected petition was filed, the government argues that the statute of limitations expired on March 16, 2007. We disagree.

Jackson's submission of an oversized habeas brief and a motion to permit the extra pages to the Supreme Court of Virginia constituted "delivery and acceptance . . . in compliance with the applicable laws and rules governing filings." Artuz v. Bennett, 531 U.S. 4, 8 (2000). Jackson's initial petition was neither rejected nor dismissed by the Supreme Court of Virginia. Jackson was instead directed to file a "corrected petition" in a timely manner. J.A. 1140. The Supreme Court of Virginia's emphasis on "correction" indicates to us that the requested alteration constituted an amendment to Jackson's initial filing.

In any event, it is apparent from the record that Jackson relied on the federal district court's grant of an extension to April 17, 2007 when timing the submission of his federal habeas brief. Significantly, the government raised no objection to Jackson's statute-of-limitations calculations prior to that

31

deadline, nor did it otherwise suggest that Jackson's federal habeas petition should be time-barred. Even if the government were correct that Jackson's oversized petition was not "properly filed," under these circumstances, Jackson would undoubtedly be entitled to equitable tolling. See Green v. Johnson, 515 F.3d 290, 304 (4th Cir. 2008) (noting that equitable tolling is appropriate when "due to circumstances external to the party's own conduct--it would be unconscionable to enforce the limitation period against the party and gross injustice would result").

## B.

The government also urges that the district court erred by holding an evidentiary hearing. We consider that argument in light of the Supreme Court's recent delineation of such hearings' limited role in federal habeas proceedings.

In Cullen v. Pinholster, the Supreme Court clarified that AEDPA limits federal habeas review "to the record that was before the state court that adjudicated the claim on the merits." 2011 WL 1225705, at *8. In other words, when a habeas petitioner's claim has been adjudicated on the merits in state court, a federal court is precluded from supplementing the record with facts adduced for the first time at a federal evidentiary hearing. See id. at *9 ("It would be strange to ask federal courts to analyze whether a state court's adjudication

32

resulted in a decision that unreasonably applied federal law to facts not before the state court.").

The district court did not have the benefit of Cullen's guidance when it determined that a hearing was warranted because Jackson had "alleged sufficient facts that, if fully established, would entitle him to relief on two of the 17 claims raised in his federal habeas petition." J.A. 1527-28. It is now clear, however, that the court's reliance on material developed at the federal evidentiary hearing was at odds with AEDPA's placement of "primary responsibility [for habeas review] with the state courts," and illustrated the difficulties inherent in "allow[ing] a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo." Cullen, 2011 WL 1225705, at *8. Mindful that "evidence introduced in federal court has no bearing on §2254(d)(1) review," id. at *10, we proceed to assess Jackson's petition on the basis of the facts contained in the state-court record.

IV.

We turn to the standards by which we evaluate the merits of the issues before us on appeal and cross-appeal. Our review is bounded by the familiar contours of AEDPA deference, which, as

recently reinforced by the Supreme Court's unanimous decision in Harrington v. Richter, 131 S. Ct. 770 (2011), helps to ensure "confidence in the writ and the law it vindicates."  Id. at 780. We may grant habeas relief on claims adjudicated on their merits in state court only if that

> adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Appleby v. Warden, 595 F.3d 532, 535 (4th Cir. 2010) (internal quotations omitted) (citing 28 U.S.C. § 2254(d)).

A state court's holding is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an opposite result.  Lewis v. Wheeler, 609 F.3d 291, 300 (4th Cir. 2010) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)).  By contrast, a "state court unreasonably applies federal law when it 'identifies the correct governing legal rule from th[e] Court's cases but unreasonably applies it to the facts of the particular . . . case,'" or "unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that

34

principle to a new context where it should apply." Id. at 300-01 (quoting Williams, 529 U.S. at 407) (alterations in original). In short, to obtain federal habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-87; see also Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (noting that on AEDPA review, the pertinent question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold").

To demonstrate ineffective assistance of counsel, Jackson must show "that counsel's performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citing Strickland, 466 U.S. at 687). This two-part analysis presents a "high bar" to petitioners, and we must assess their efforts to surmount it with "scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve." Harrington, 131 S. Ct. at 788 (internal quotations omitted).

Even if Jackson could satisfy the "difficult standard" of Strickland's first prong, James v. Harrison, 389 F.3d 450, 457

35

(4th Cir. 2004), he would still be required to show prejudice. In a capital case, "the prejudice inquiry centers on 'whether there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Williams v. Ozmint, 494 F.3d 478, 484 (4th Cir. 2007) (quoting Strickland, 466 U.S. at 695) (alterations in Ozmint). Such a showing "requires a substantial, not just conceivable, likelihood of a different result." Cullen, 2011 WL 1225705, at *12 (internal quotations omitted). When making this determination we review the "totality of the evidence before the . . . jury." Ozmint, 494 F.3d at 484.

## V.

Against the backdrop of these highly deferential standards we proceed to the issues before us. We begin with the government's challenge to the grant of federal habeas relief on Jackson's mitigation-related claims. We then turn to the government's appeal of the district court's grant of relief on Jackson's claims of instructional error and to Jackson's related claims on cross-appeal. For the reasons described below, we conclude the writ was improvidently granted.

A.

Like the Supreme Court of Virginia, we bypass whether defense counsel's performance was deficient and proceed directly to the prejudice prong of the Strickland analysis. See Strickland, 466 U.S. at 688; see also McHone, 392 F.3d at 704. We conclude that the state court's finding that Jackson had not shown prejudice arising from any alleged mitigation-related deficiencies was not "clearly unreasonable" and that the district court erred by holding otherwise.

We first address Jackson's claim that counsel's failure to interview his siblings had a substantial likelihood of affecting the outcome of penalty-phase proceedings. Given the array of evidence of childhood abuse presented to the jury, nothing in the state-court record shows that the Supreme Court of Virginia unreasonably determined that the failure to develop and present testimony from Jackson's siblings did not constitute Strickland prejudice.

As described above, counsel called seventeen mitigation witnesses, including nine professionals, many of whom had treated or worked with Jackson when he was a child, five family members, Jackson's godmother, the family's pastor, and Jackson himself. These mitigation witnesses' testimony shed considerable light on Jackson's traumatic childhood. For instance, in response to probing inquiries from counsel, the

37

social worker who had researched multiple instances of Jackson's childhood abuse read an account of her investigation suggesting that Jackson and his brother had been "outright raped." J.A. 899. The jury also heard record evidence that Jackson's stepfather harangued him in the midst of counseling sessions, stating that "he hate[d] him and that [Jackson wa]s evil." Id. at 825. These are just two of many, striking examples of physical and emotional abuse presented to the jury at the penalty phase.[11]

Even the district court's selective summary[12] of the proceedings at trial illustrates the severity of the accounts of

---

[11] The district court noted that this disturbing language appeared in the written records assembled by counsel; indeed, it cited these two statements as data reviewed by counsel that should have prompted further investigation. Jackson III, 699 F. Supp. 2d at 847. However, the court failed to mention that these same accounts were read to the jury. In summarizing the witnesses' presentations of these reports, the court blandly alluded to the former incident as an alleged sexual assault and to the latter as "verbal[] abus[e]." Id. at 856-57.

[12] The district court's minimization of the potency of mitigation evidence at trial is notably illustrated by its assertion that the trial court "warned" defense counsel about the dryness of his evidence. See Jackson III, 699 F. Supp. 2d at 845. The pertinent statement was not a "warning." It was instead offered as a rationale for continuing with mitigation witnesses after counsel noted that Jackson had not taken his medication, which Jackson explained "help[ed him] to stay awake." J.A. 887. The trial court noted that he had seen Jackson "looking down and looking around," but reasoned that such behavior was understandable given the nature of the witnesses' testimony. J.A. 888.

38

abuse presented to the jury in mitigation.  See Jackson III, 699 F. Supp. 2d. at 855-58.  Testimony from Jackson's trial recounted by the district court included descriptions of Jackson suffering a broken arm when he was less than two years old (an injury which neither of his parents could explain); being sexually assaulted; receiving medical treatment on multiple occasions for severe bruising; finding himself locked out of his apartment by his biological father at a young age; being struck with a belt; enduring a beating in the eye and chest with a large stick; and, on at least one occasion, having to strip naked and perform exercises before being beaten.  See Jackson III, 699 F. Supp. 2d. at 855-58.  The district court also cited testimony that Jackson's father "had a reputation for alcohol consumption" and that his stepfather had been criminally prosecuted for child abuse, which resulted in a suspended sentence, a protective order, and mandatory counseling.  Id.

Against the backdrop of this mitigation evidence, the Supreme Court of Virginia supportably found that the testimony described in Jackson's siblings' affidavits would have been "largely cumulative" of material already before the jury, as they amounted to "anecdotal evidence of specific instances of the abuse from the perspective of [Jackson's] siblings." Jackson II, 627 S.E.2d at 787.  As a result, the state court reasoned, the failure to develop and present Jackson's siblings

39

as witnesses was not substantially likely to have affected the outcome of penalty-phase proceedings. Given the breadth and depth of evidence of childhood abuse provided to the jury, we cannot say that determination was clearly unreasonable. See Harrington, 131 S. Ct. at 791.

We also see no basis on which to conclude that counsel's alleged failure to present positive character evidence prejudiced Jackson. The district court's contrary finding reflected a lack of deference to the Supreme Court of Virginia's threshold factual conclusion "that the jury heard evidence of [Jackson's] good qualities." Jackson II, 627 S.E.2d at 787. The district court's dismissal of the statements on which the Supreme Court of Virginia relied as "bland, hearsay comments," which "offered no real insight into Jackson's character or personality," Jackson III, 699 F. Supp. 2d at 852, constituted an assessment of the potency of the positive mitigation evidence rather than the existence of such evidence. Put otherwise, the bare insistence that the positive statements cited by the Supreme Court of Virginia did not constitute "genuine" evidence was far from a refutation by clear and convincing evidence of the Supreme Court of Virginia's factual conclusion. See 28 U.S.C. § 2254(e)(1). Although it invoked AEDPA's language, the district court did not give that standard sufficient "operation or function in its reasoning." Harrington, 131 S. Ct at 787.

40

More fundamentally, the district court's "reweigh[ing of] the evidence in aggravation against the totality of available mitigating evidence," was conspicuously one-sided. Wiggins, 539 U.S. at 534; see also Emmett v. Kelly, 474 F.3d 154, 170 (4th Cir. 2007). Specifically, the district court failed to mention considerable evidence regarding the horrific circumstances of Jackson's rape and murder of Mrs. Phillips. This omission was particularly striking in light of the government's careful emphasis on the disturbing details of Jackson's crimes at closing.

The troubling circumstances highlighted by the government included the fact that Jackson intruded upon the "sanctity of [Mrs. Phillips's] home," despite the fact that her car was parked outside; that he had entered through a window that she had left "open just a little bit so she did not have to use [her] air conditioner, so she could save some money," J.A. 960; that he ignored her plea to take what he wanted and leave; that after raping and murdering her, he absconded with her car; that he left his victim with her dress pulled up and her body grotesquely twisted; and that he used the money he took from her purse to buy drugs.

The government also pointedly emphasized Jackson's own testimony during the guilt phase, noting that his retreat from his earlier videotaped statement "absolutely showed no remorse."

41

Id. at 961. The government further observed that Jackson "had the audacity" to claim that Mrs. Phillips had not been raped and to attempt to shift blame to his alleged accomplices. Id. at 961-62. This body of aggravating evidence only reinforces our determination that the Supreme Court of Virginia was not clearly unreasonable in determining that Jackson had failed "to demonstrate how additional evidence of his good character, such as his love for his grandmother and his desire that his parents reunite, would have affected the jury's determination." Jackson II, 627 S.E.2d at 787.

Finally, we turn to Jackson's assertion that counsel failed to present expert testimony linking childhood abuse to adult behavior. The Supreme Court of Virginia did not address this claim, see supra n. 2, and the district court declined to make an independent finding of prejudice arising from the absence of psychological testimony, see Jackson III, 699 F. Supp. 2d at 864. In light of the balance of aggravating and mitigating evidence discussed above, we are unconvinced that such expert testimony would have yielded "a 'substantial' . . . likelihood of a different result." Cullen, 2011 WL 1225705, at *12 (quoting Harrington, 131 S. Ct. at 791).

In sum, we find that even if counsel's development and presentation of mitigation evidence was deficient, any

42

deficiencies did not amount to prejudice under Strickland's second prong.

B.

The remaining claims on which the district court granted relief, as well as Jackson's claims on cross-appeal, all involve alleged instructional error, arising out of the trial court's failure to specifically instruct the jury on particular mitigating factors. We begin with the claim on which habeas relief was granted, i.e., that counsel's failure to object to the lack of a specific mitigation instruction constituted constitutionally deficient representation. As this argument was adjudicated on a complete factual record in state court, we review it through the "doubly" deferential lens of AEDPA and Strickland, Cullen, 2011 WL 1225705, at *12; Harrington, 131 S. Ct. at 788, and conclude that it lacks merit.

We briefly recount the disputed jurors' colloquies at voir dire. Juror Dana Metheny initially responded "No" when asked by defense counsel whether she would "be able to consider the age of Mr. Jackson in making a decision on whether to impose life without the possibility of parole, or death." J.A. 639. She repeated her answer after counsel clarified that the question was whether she would consider "age or any other evidence that we may put before you if we so elect . . . in mitigation that you may consider; family, doctors, past, the way he grew up."

43

Id. at 639-40. However, she repeatedly responded "Yes" when asked if she would consider such issues if instructed to do so by the court. E.g., id. ("If the Court tells you to consider issues in mitigation, such as age, such as background, such as family, such as psychological or psychiatric issues, would you consider those issues in mitigation before you voted for death?" "Yes.").

Juror Wendy Berube expressed similar reluctance to consider age as mitigating evidence. When asked whether she would consider factors in mitigation, she responded "Yes. I mean, I would consider everything," adding "I don't think that age matters, if that is what you're asking." Id. at 665-66 (emphasis added). When queried "If the Court instructs you age matters, would you then consider it?" she responded "Yes." Id. at 666. She gave the same response when asked if she would "follow the Court's instructions?" Id. In deeming both jurors qualified to serve, the trial court stated: "They don't know whether [age is] a factor for them to consider or not . . . [B]ut when they're told that it's a factor they must consider or they should consider, not what weight they'd give to it, they all agree that they'll consider it." Id. at 671.

The district court's grant of habeas relief was anchored in its reading of the jurors' colloquies and the trial court's statement as a clear indication that neither juror was qualified

44

to serve unless they were "specifically instructed" to consider various types of mitigation evidence. Jackson III, 699 F. Supp. 2d at 866. However, the Supreme Court of Virginia supportably found that the "contention that qualification of these jurors was 'conditioned' upon the giving of a specific instruction is not supported in fact or in law." Jackson II, 627 S.E.2d at 788. Neither the district court's analysis nor Jackson's argument on appeal shows that the state court's conclusion was clearly unreasonable. As a result, AEDPA mandates that we defer to the state court's assessment.[13]

Both jurors plainly expressed their willingness to consider any and all mitigation evidence if instructed to do so by the judge. The trial court provided just such an instruction,

---

[13] The district court erred when it declined to afford such deference to the state court's fact finding. Jackson III, 699 F. Supp. 2d at 853. The Supreme Court of Virginia found that any request for a specific instruction "would have been properly refused." Jackson II, 627 S.E.2d at 788. In support of its holding the state court cited Virginia precedents illustrating the appropriateness of general instructions. See id.; see also Gray v. Commonwealth, 356 S.E.2d 157, 178 (Va. 1987) ("[F]ailure to list mitigating factors inures to the benefit of a defendant."); LeVasseur v. Commonwealth, 304 S.E.2d 644, 661 (Va. 1983) ("We have repeatedly held that an instruction is improper which singles out one portion of the evidence for special emphasis.").

This body of caselaw may be why the trial court did not present an itemized instruction on its own initiative. In any event, Virginia precedent on this point, as well as the trial court's decision to proceed with a general instruction, provided sufficient support for the state court's determination so as to warrant AEDPA deference.

45

admonishing the jury that "in determining the appropriate punishment you shall consider any mitigation evidence presented of circumstances which do not justify or excuse the offense but which in fairness or mercy may extenuate or reduce the degree of moral culpability and punishment." J.A. 617 (emphasis added).

Significantly, both age and background had been expressly presented to the jury by defense counsel as mitigating factors. We have already described counsel's argument that Jackson's traumatic childhood should be weighed in mitigation. Counsel also specifically emphasized Jackson's relative youth at the time he committed the rape and murder. See, e.g., Id. at 972 ("[Y]ou have a videotape back there [of Jackson's confession] . . . [W]atch that 19-year-old kid talk."); id. at 973 ("Life for a 20-year-old man without the possibility of parole. Ever. That's what we ask.").

More fundamentally, there is simply no factual or legal basis for the district court's apparent assumption that either juror was "conditionally" qualified and that a specific mitigation instruction was therefore constitutionally mandated. Tellingly, in his brief and at oral argument, Jackson could not cite a single case in which such conditional qualification had been recognized. Nor were we able to find one. As the Supreme Court of Virginia found, "[b]oth jurors were qualified upon the trial court's determination that they would be fair and

46

impartial." Jackson II, 627 S.E.2d at 788; see also Bell v. Cone, 543 U.S. 447, 456 (2005) (noting "the presumption that state courts know and follow the law" (internal quotation omitted)). Nothing more was required.

By the same token, the district court's reliance on cases in which factfinders declined to give any consideration to mitigating evidence was misplaced. As explained above, there is no evidence here that either of the jurors refused to consider such evidence following the trial court's instruction. Cf. Morgan v. Illinois, 504 U.S. 719, 736 (1992) (discussing jurors who "obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty"); Eddings v. Oklahoma, 455 U.S. 104, 113 (1982) (noting trial judge's erroneous conclusion that "as a matter of law he was unable even to consider the [mitigating] evidence" of defendant's family history). Both jurors stated that they would listen to an instruction to consider mitigating evidence; they were ultimately admonished to do just that. Absent any indication that the Supreme Court of Virginia's analysis was clearly unreasonable, counsel's failure to object to the lack of a specific mitigating instruction cannot support a claim for habeas relief.

For the same reasons, Jackson's claims on cross-appeal lack merit. Jackson argues that (1) Juror Berube should not have

47

been seated in the first place because she would not consider age as a mitigating factor, (2) both disputed jurors were rendered unfit for service when no specific instruction was given and the trial court erred by not removing them on its own motion, and (3) defense counsel's failure to move to strike the jurors when a specific mitigating instruction was not provided was unreasonable.  However, as the Supreme Court of Virginia supportably found, the jurors' service was not "conditional." Any concerns the jurors expressed were adequately addressed by the general mitigation instruction.


VI.

For the foregoing reasons we reverse the district court's grant of habeas relief in this case.

REVERSED