**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LEON J. WINSTON,
                *Petitioner-Appellee,*

v.

EDDIE L. PEARSON, Warden, Sussex
I State Prison,
                *Respondent-Appellant.*

No. 11-4

LEON J. WINSTON,
                *Petitioner-Appellant,*

v.

EDDIE L. PEARSON, Warden, Sussex
I State Prison,
                *Respondent-Appellee.*

No. 11-5

Appeals from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, District Judge.
(7:07-cv-00364-SGW)

Argued: May 15, 2012

Decided: June 25, 2012

Before GREGORY, DUNCAN, and DIAZ, Circuit Judges.

---

Affirmed by published opinion. Judge Diaz wrote the opinion,
in which Judge Gregory and Judge Duncan joined.

**COUNSEL**

**ARGUED:** Katherine Baldwin Burnett, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellant/Cross-Appellee. Jennifer Leigh Givens, FEDERAL COMMUNITY DEFENDER OFFICE, Philadelphia, Pennsylvania, for Appellee/Cross-Appellant. **ON BRIEF:** Kenneth T. Cuccinelli, II, Attorney General of Virginia, Richmond, Virginia, for Appellant/Cross-Appellee. Leigh M. Skipper, Chief Federal Defender, James Moreno, Aren Adjoian, FEDERAL COMMUNITY DEFENDER OFFICE, Philadelphia, Pennsylvania, for Appellee/Cross-Appellant.

---

**OPINION**

DIAZ, Circuit Judge:

A Virginia jury convicted Leon Winston of capital murder. The court, following the jury's recommendation, sentenced Winston to death. Winston's direct appeals failed and his conviction became final, at which point he sought habeas relief in state court. The Supreme Court of Virginia denied relief, rejecting Winston's requests for discovery and an evidentiary hearing.

Winston then filed a habeas petition in federal court. The district court granted him an evidentiary hearing to explore whether his trial attorneys were ineffective for failing to raise the claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), that his mental retardation categorically barred imposition of a death sentence. But the court, after presiding over the hearing, reversed course and held that it was precluded from considering any evidence adduced during the federal proceeding. Looking only to facts presented in the state habeas proceeding and conducting a deferential review of the state-court deci-

sion, the court denied Winston's petition for habeas relief. *Winston v. Kelly*, 600 F. Supp. 2d 717, 722–23 (W.D. Va. 2009).

We vacated in part the district court's decision on appeal, ordering it to conduct a de novo review of Winston's ineffectiveness claim while entertaining the evidence offered during the federal hearing. *Winston v. Kelly (Winston I)*, 592 F.3d 535, 553 (4th Cir. 2010). On remand, the district court granted Winston's petition for habeas relief and vacated his death sentence. *Winston v. Kelly*, 784 F. Supp. 2d 623, 626 (W.D. Va. 2011). Virginia timely filed this appeal.

The Commonwealth contends principally that intervening Supreme Court precedent has eroded the foundation of our prior opinion in *Winston I*, compelling us to forgo de novo review and instead accord substantial deference to the Supreme Court of Virginia's decision denying habeas relief. Under the appropriate standard, maintains the Commonwealth, Winston's habeas petition lacks merit.

We disagree and find nothing in recent Supreme Court decisions that calls into question our reasoning in *Winston I*, which, as law of the case, we may not lightly disturb. Reviewing Winston's ineffectiveness claim de novo, we agree with the district court that Winston has established that his trial attorneys rendered deficient performance that prejudiced him. We therefore affirm the district court's grant of habeas relief.[1]

## I.

### A.

On the morning of April 19, 2002, two men broke into Rhonda and Anthony Robinson's home and killed them.

---

[1]As we explain below, we reject Winston's cross-appeal and affirm the district court's judgment as to remedy.

Police later arrested Winston, and the Commonwealth charged him with capital murder and several lesser crimes. Winston proceeded to trial, at which a jury found him guilty of capital murder and related crimes.

During the sentencing phase of the trial, Winston's attorneys presented records of his psychological evaluations and testimony about his family history. The attorneys used the records and testimony as ordinary mitigating evidence to illuminate Winston's troubled childhood and subaverage intellectual functioning, but not to establish mental retardation. At the conclusion of the sentencing proceeding, the jury recommended a sentence of death for each of the murders. Agreeing with the jury's recommendation, the court sentenced Winston to death. The Supreme Court of Virginia affirmed the convictions, and the U.S. Supreme Court denied Winston's petition for certiorari.

B.

Winston filed a habeas petition in the Supreme Court of Virginia, raising dozens of claims. Refusing—without explanation—Winston's requests for an evidentiary hearing and discovery, the Supreme Court of Virginia denied all relief.

Germane to this appeal, the court rejected Winston's *Atkins* and *Atkins*-related claims. Winston maintained that *Atkins* barred his execution because he met Virginia's statutory definition of mental retardation. In support of this contention, Winston offered a Fairfax County Public Schools special-education eligibility reclassification form ("Reclassification"), which indicated that school officials had reclassified him as mentally retarded. He was unable to proffer any IQ scores or other data on which counselors relied to make this determination. Winston also submitted the scores of three IQ tests, all of which exceeded 70, the maximum score that Virginia accepts as evidence of mental retardation.

The Supreme Court of Virginia first held that Winston's *Atkins* claim, raised for the first time in the habeas petition, was barred for failure to exhaust. It then considered whether the failure of Winston's trial attorneys to present evidence of his mental retardation amounted to ineffectiveness of counsel, such that it would excuse the procedural default. The court answered this query in the negative, concluding that Winston had "failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different." J.A. 306. It found no evidence that Winston had been "diagnosed as being mentally retarded before the age of 18 in accordance with the legal definition of mental retardation established by the legislature." *Id.* 305–06. None of the three IQ scores presented to the court were 70 or below, which precluded Winston from meeting the state's criteria for mental-retardation classification. Although Winston presented the Reclassification, the court noted that students may be classified as mentally retarded for educational purposes even if they have an IQ above 70.

## C.

### 1.

Winston next filed a habeas petition in the U.S. District Court for the Western District of Virginia, pursuant to 28 U.S.C. § 2254. Winston's petition raised in excess of thirty claims. In an initial decision, the court rejected all of the claims save for his *Atkins* and *Atkins*-related claims. As to those, the court "conclude[d] that an evidentiary hearing [was] appropriate to determine whether counsel rendered ineffective assistance at sentencing both as a free-standing claim and as cause and prejudice to excuse procedural default of Winston's *Atkins* claim." J.A. 611. Winston's diligence in pursuing the claims, combined with the real possibility that he could prevail even under the deferential standards of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), confirmed the

propriety of ordering an evidentiary hearing, reasoned the court.

Winston used the evidentiary hearing to sharpen his ineffective-assistance-of-counsel claim. Most crucial, the hearing enabled Winston to produce for the first time a 1997 IQ test, taken when he was sixteen years old, reflecting a score of 66. Because Virginia law mandates that an individual prove an IQ of 70 or below to support his classification as mentally retarded, presentation of the 1997 test was vital to Winston's *Atkins* ineffectiveness claim.

The attorneys who represented Winston at trial, Glenn Berger and B. Leigh Drewry, Jr., testified at the evidentiary hearing. Although they obtained Winston's educational records from Fairfax County Public Schools, neither Berger nor Drewry read the complete records. Instead, they sent them to Dr. Evan Nelson, Winston's court-appointed mental-health expert. The attorneys testified that they had no strategic reason for neglecting to review the records prior to forwarding them to Nelson. Included in the records that counsel failed to review was the Reclassification, which reflected school officials' determination that Winston was mentally retarded. As Drewry, who led preparation for the penalty phase of the trial, testified, review of the Reclassification would have prompted him to investigate Winston's mental retardation.

Not only did counsel not review Winston's school records, they failed to interview any of Winston's teachers or counselors at the school. At the evidentiary hearing, several school officials recounted their experiences with Winston, which convinced them of his severe limitations in cognitive functioning. These officials would have testified during Winston's sentencing hearing, but his attorneys never sought them out. Marilynn Lageman, one such official, would have provided evidence of Winston's 66 IQ score had she been contacted by Winston's attorneys. Although the result of that test was not included in the school records obtained by counsel, Lageman

testified that the score was saved on a computer disk in her office at the time of the trial. Because she was a school psychologist who was actively involved with Winston's education, Lageman's name appeared on some of the records obtained by counsel. Drewry testified that he would have interviewed Lageman if he had seen the records listing her name.

Nelson, Winston's court-appointed mental-health expert, testified about his evaluation of Winston's case. Based on the information at his disposal, Nelson concluded at the time of trial that Winston likely did not satisfy the diagnostic criteria for mental retardation under Virginia law. Although he reviewed the school records obtained by counsel, Nelson did not recall specifically considering the Reclassification. He stated that a closer review of that form along with receipt of information from Winston's school teachers and counselors would have been important to his analysis. Indeed, had Nelson noticed the Reclassification, he would have investigated the circumstances surrounding it. For his part, Drewry stated that he would have followed up with Nelson and brought the Reclassification to his attention, had he noticed it. Nelson further testified that the 66 IQ score would have been significant to his analysis. In sum, Nelson stated that consideration of the Reclassification, the 66 IQ score, and information from Winston's school teachers and counselors could have impelled him to determine that Winston was, in fact, mentally retarded under state law. "It's certainly possible," testified Nelson, "my opinion might have been different with this wealth of other information." *Id.* 720.[2]

As it played out at trial, however, Winston's attorneys

---

[2]Two other experts submitted reports for use in the evidentiary hearing. Dr. Daniel Reschly, Winston's expert, determined that Winston was mentally retarded under Virginia law. The Commonwealth countered with a report from Dr. Leigh Hagan, who concluded that Winston was not mentally retarded pursuant to Virginia law.

decided not to call Nelson to testify. Drewry felt that Nelson's testimony would in fact damage Winston's case, as it would allow the Commonwealth to introduce Nelson's conclusions that Winston exhibited antisocial behavior and had a capacity for future dangerousness. Berger and Drewry thus chose not to press the claim that Winston was mentally retarded under Virginia law.

Though the district court allowed Winston to develop his *Atkins* and *Atkins*-related claims at an evidentiary hearing, it ultimately determined that it could not consider any of the evidence produced for the first time in the federal arena. Finding that the 66 IQ score "fundamentally alter[ed] Winston's ineffective assistance claim and [Winston] [could not] account for his failure to present it to the Supreme Court of Virginia," the court held that Winston failed to exhaust the newly positioned claim, constraining it to consider the claim only "as it was fairly positioned before the Supreme Court of Virginia." *Winston*, 600 F. Supp. 2d at 722.

The district court moreover noted that the state-court decision qualified as an adjudication on the merits, requiring it to apply the deferential standards of 28 U.S.C. § 2254(d). Viewing only the evidence presented in state court through the prism of § 2254(d), the court concluded that "the Supreme Court of Virginia's adjudication on the merits of Winston's ineffective assistance claim, at least as to *Strickland*'s [*Strickland v. Washington*, 466 U.S. 668 (1984)] prejudice prong, was not unreasonable." *Winston*, 600 F. Supp. 2d at 723. The court consequently denied Winston's habeas petition.

2.

We vacated in part the district court's decision on appeal, deeming erroneous its denial of Winston's *Atkins* and *Atkins*-related claims but affirming on all other grounds. We first held that "it was error for the district court to refuse to consider [the 66 IQ score] because the score does not fundamen-

tally alter Winston's claims and because habeas counsel was diligent in searching for it." *Winston I*, 592 F.3d at 539. Explaining that a district court may "consider new evidence if it supports factual allegations for which there is already at least some support in the state record," we concluded that Winston had cleared this bar by "offer[ing] some evidence in state court to support the factual claim that he possesses significantly sub-average intellectual functioning as measured by a standardized test." *Id.* at 550. And because Winston was diligent in seeking the evidence to support his *Atkins* and *Atkins*-related claims, we determined that the court on remand was required to consider the claims with the 66 IQ score as evidence.

We then weighed the appropriate standard under which the district court was required to review the state-court denial of Winston's habeas petition. We ultimately concluded that deference to the Supreme Court of Virginia's decision was unwarranted under § 2254(d), because that court had not adjudicated Winston's claims on the merits. The district court was obligated, however, to extend deference to any relevant factual findings made by the state court, as provided in § 2254(e)(1).

That the Supreme Court of Virginia did not adjudicate Winston's *Atkins* ineffectiveness claim on the merits served as the linchpin of our decision. We reasoned that, when a state court does not adjudicate a claim on the merits, AEDPA deference is inappropriate and a federal court must review the claim de novo. Whether a claim has been adjudicated on the merits is a case-specific inquiry, and we consequently rejected Winston's entreaties to hold that § 2254(d) "will never apply once the district court has granted an evidentiary hearing." *Id.* at 553. But when a state court unreasonably refuses to permit "further development of the facts" of a claim, de novo review might be appropriate:

> [W]hen a state court forecloses further development of the factual record, it passes up the opportunity that

exhaustion ensures. If the record ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d). New, material evidence, introduced for the first time during federal habeas proceedings, may therefore require a de novo review of petitioner's claim.

*Id.* at 555–56 (citations omitted). Lest our holding be viewed as a pliable safety valve for habeas petitioners, we reiterated that "the requirements that petitioners exhaust their state remedies and diligently develop the record in state court are exacting burdens." *Id.* at 556. Indeed, new evidence submitted in federal court that fundamentally alters a claim presented in state court will render that claim unexhausted. Similarly, that a petitioner requested an evidentiary hearing from the state court, without more, might not always suffice to satisfy AEDPA's diligence requirement.

Turning to the facts of Winston's case, we determined that the Supreme Court of Virginia had not adjudicated his *Atkins* ineffectiveness claim on the merits. We first reasoned that Winston's 66 IQ score "is material to whether he is retarded under Virginia law and therefore material to whether he was prejudiced . . . by his counsel's conduct." *Id.* at 557. We stressed that the state court "had its opportunity to consider a more complete record, but chose to deny Winston's request for an evidentiary hearing." *Id.* at 553. The state court's denial of discovery and an evidentiary hearing produced an adjudication of "a claim that was materially incomplete." *Id.* at 557. And because the ineffectiveness analysis requires a "collective evaluation of the evidence rather than an analysis confined to a subset of the facts," we concluded that the state court's legal conclusions were not "neatly separable into those based on a complete record and those based on an incomplete record." *Id.* We accordingly instructed the district court to

extend no deference under AEDPA to the Supreme Court of Virginia's application of the ineffectiveness standards.

Relevant factual findings made by the Supreme Court of Virginia were entitled to deference under § 2254(e)(1), we acknowledged. Such findings included those made on the basis of Winston's three above-70 IQ scores and the standards used by the Fairfax County Public Schools when assessing whether a student is mentally retarded. But "[w]here the [Supreme Court of Virginia] did not make a factual finding," we instructed the district court to "make its own without regard to what the state court might have done." *Id.*

3.

On remand, the district court granted Winston's habeas petition as to his *Atkins* ineffectiveness claim. The court first concluded that Winston's trial attorneys rendered deficient performance for failing to review the school records and conduct follow-up investigations on the legal issues implicated by the documents. It adjudged the deficiency prejudicial, ascertaining a "reasonable probability that but for counsel's unprofessional errors, the outcome of Winston's proceeding would have been different"—i.e., he would not have been sentenced to death. *Winston*, 784 F. Supp. 2d at 626. Heeding our directive in *Winston I*, the court accorded § 2254(e)(1) deference to two factual findings of the state court: that Winston achieved scores of 77, 76, and 73 on three IQ tests; and that he could have been reclassified as mentally retarded by school officials even without scoring 70 or below on an IQ test. In its statement of remedy, the court ordered the Commonwealth to "conduct a trial on the question of whether Winston is mentally retarded, and sentence him accordingly, or otherwise resentence him without the possibility of death." *Id.* at 635.

Challenging the form of relief, Winston moved to alter or amend the judgment so that the court would expressly grant him a full sentencing retrial, not merely a limited trial on

mental retardation. The court denied Winston's motion. It first acknowledged that its "notation concerning the consequences of [its] decision is essentially surplusage," as it lacked authority to describe with precision the steps that the Commonwealth must take to comply with its mandate. Supp. J.A. 35. In any event, reasoned the court, its "wording [of the remedy] was intended to make it plain that Virginia could comply with the writ without conducting a full resentencing." *Id.*

These appeals followed.

## II.

To effectuate a regime that embraces federalism in the habeas realm, AEDPA carefully circumscribes federal review of the habeas claims of state prisoners. The statute erects a formidable obstacle to state prisoners seeking to disturb state-court habeas decisions:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "[A] determination of a factual issue made by a State court shall be presumed to be correct" in such a case, with the petitioner bearing "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1).

We consider the Commonwealth's appeal against the backdrop of AEDPA and our prior opinion in this case.

III.

We turn first to determine the amount of deference properly accorded the Supreme Court of Virginia's decision denying Winston's habeas petition. It is critical, at the outset, to frame the bounds of our inquiry, constrained as it is by the law-of-the-case doctrine. We are not writing on a blank slate, at liberty to revisit our decision in *Winston I* on a whim. *Winston I*, as the law of the case, "'continue[s] to govern the same issues in subsequent stages in the same case,'" *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) (quoting *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)), and we will not "reconsider our previous holding" absent "extraordinary circumstances," *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 632 (D.C. Cir. 2010) (alteration and internal quotations omitted). Thus our legal conclusions in *Winston I* are subject to challenge only, as is relevant here, if "'controlling authority has since made a contrary decision of law applicable to the issue.'" *TFWS, Inc.*, 572 F.3d at 191 (quoting *Aramony*, 166 F.3d at 661).

The Commonwealth contends that intervening Supreme Court precedent has impeached the legal framework of *Winston I*, compelling us to review the state-court decision under § 2254(d)'s unreasonableness standard. According to the Commonwealth, *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), and *Harrington v. Richter*, 131 S. Ct. 770 (2011), establish that the Supreme Court of Virginia's denial of Winston's

habeas claims was an adjudication on the merits, entitled to substantial deference under AEDPA.

As we explain below, we are not persuaded by the Commonwealth's interpretation of *Pinholster* and *Richter*. Neither case expressly delineates the contours of an "adjudication on the merits" for AEDPA purposes, and we require more than conjecture about the views of the Supreme Court before we retreat from a decision that is the law of the case. Our decision in *Winston I* therefore endures. The Supreme Court of Virginia's denial of Winston's *Atkins* ineffectiveness claim was not an "adjudicat[ion] on the merits" under § 2254(d). We must consequently proceed to review the claim de novo.

A.

The Commonwealth anchors its argument in its reading of *Pinholster* and *Richter*. A review of these cases will accordingly focus our analysis.

The Supreme Court in *Pinholster* reviewed the Ninth Circuit's grant of habeas relief to a California prisoner. The Supreme Court of California unanimously and summarily dismissed two habeas petitions submitted by Pinholster. *Pinholster*, 131 S. Ct. at 1396–97. Pinholster sought habeas relief in federal court, and the district court held an evidentiary hearing and granted his petition. *Id.* at 1397. The Ninth Circuit affirmed en banc, holding that new evidence adduced at a federal evidentiary hearing could be considered in performing analysis under § 2254(d)(1). *Id.*

Holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," the Supreme Court rejected the Ninth Circuit's construction of AEDPA and reversed. *Id.* at 1398. The Court characterized § 2254(d)(1)'s language as "backward-looking" and "requir[ing] an examination of the state-court decision at the time it was made." *Id.* "It follows,"

continued the Court, "that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court." *Id.* Summarizing its discussion, the Court wrote, "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Id.* at 1400.

The Court rejected the argument that its holding rendered § 2254(e)(2)[3] superfluous, in that § 2254(d) would now impose a wholesale bar on federal evidentiary hearings, affording § 2254(e)(2) no independent significance. It reasoned that § 2254(e)(2) "continues to have force where § 2254(d)(1) does not bar federal habeas relief," as when a habeas claim does not fall under its compass because it was not adjudicated on the merits in state court. *Id.* at 1401.

Applying the foregoing principles to Pinholster's petition, the Court held that § 2254(d) controlled the case. *Id.* at 1402. Pinholster's ineffectiveness claim had been adjudicated on the merits in state court, and the parties agreed that the federal claim was the same as that included in his state petitions. *Id.* Though the Supreme Court of California summarily adjudicated Pinholster's petitions, the Court held that § 2254(d) "applies even where there has been a summary denial." *Id.*

Justice Sotomayor's dissent explored the reach of the majority's analysis. She first expressed agreement with the majority's rejection of an approach apparently advanced by some circuit courts. Citing *Winston I*, Justice Sotomayor asserted, "Some courts have held that when a federal court

---

[3]Section 2254(e)(2) cabins a federal habeas court's discretion to grant an evidentiary hearing where a habeas petitioner "has failed to develop the factual basis of a claim in State court proceedings." As we concluded in *Winston I*, § 2254(e)(2) does not apply to Winston, as he was diligent in pursuing his *Atkins* ineffectiveness claim in state court. 592 F.3d at 551–52.

admits new evidence supporting a claim adjudicated on the merits in state court, § 2254(d)(1) does not apply at all and the federal court may review the claim *de novo*." *Id.* at 1417 (Sotomayor, J., dissenting). "[A]gree[ing] with the majority's rejection of this approach," Justice Sotomayor reasoned that endorsing this practice "would undermine the comity principles motivating AEDPA" by authorizing federal habeas courts to "decline to defer to a state-court adjudication of a claim because the state court, through no fault of its own, lacked all the relevant evidence." *Id.* She limited her rejection of the approach to claims adjudicated on the merits in state court, "assum[ing] that the majority does not intend to suggest that review is limited to the state-court record when a petitioner's inability to develop the facts supporting his claim was the fault of the state court itself." *Id.* n.5. And even when a claim was adjudicated on the merits in state court, Justice Sotomayor pointed to "situations in which new evidence supporting" such a claim "gives rise to an altogether different claim" that is not subject to the strictures of § 2254(d)(1). *Id.*

Dialogue between Justice Sotomayor and the majority shed light on the Court's holding in *Pinholster*. Justice Sotomayor proffered a hypothetical in her dissent: A petitioner diligently attempts in state court to develop the factual foundation of a claim that prosecutors withheld *Brady*[4] material. The state court denies relief on the grounds that the withheld evidence produced does not rise to a sufficient level of materiality. After its disposition, the state court orders the state to disclose additional documents that the petitioner had timely requested. The disclosed documents reveal that the state withheld other *Brady* material, but state law prevents the petitioner from presenting this new evidence in a successive habeas petition. Justice Sotomayor wondered whether the majority's holding would allow the petitioner to bolster his *Brady* claim, which was already adjudicated on the merits by the state court, in federal habeas court. *Id.* at 1417–18.

---

[4]*Brady v. Maryland*, 373 U.S. 83 (1963).

Responding to Justice Sotomayor's hypothetical, the majority first declined "to draw the line between new claims and claims adjudicated on the merits." *Id.* at 1401 n.10. It then recognized that Justice Sotomayor's hypothetical "may well present a new claim" not subject to § 2254(d). *Id.*

In *Richter*, the Court briefly added gloss to AEDPA's "adjudicated on the merits" requirement. "When a federal claim has been presented to a state court and the state court has denied relief," the Court declared that "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784–85. That a state court fails to attach an explanation to its decision does not preclude its classification as an adjudication on the merits. *Id.* at 785.

## B.

Closely scrutinizing the import of *Pinholster* and *Richter*, we find nothing in those decisions that renders infirm our analytical framework in *Winston I*. Neither decision clarifies the "adjudicated on the merits" requirement of § 2254(d)(1) such that it compels disturbing our prior holding that the state-court denial of Winston's habeas petition was not an adjudication on the merits. Remaining bound by that determination from *Winston I*, we reaffirm that § 2254(d) does not apply to Winston's *Atkins* ineffectiveness claim and that de novo review of the claim is appropriate.

Underpinning the Supreme Court's discussion in *Pinholster* is the terse acknowledgment that the habeas petitioner's claims had been adjudicated on the merits in state-court proceedings. Neither party in that case appeared to focus energy on questioning whether § 2254(d)'s adjudicated-on-the-merits requirement had been fulfilled. Echoing the parties and assuming the incandescence of the state-court decision's status, the Court phrased its holding as applying only to claims that had been adjudicated on the merits in state court. *Pinhol-*

*ster*, 131 S. Ct. at 1398 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that *adjudicated the claim on the merits*." (emphasis added)); *id.* at 1400 ("If a claim has been *adjudicated on the merits* by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." (emphasis added)). Not only that, the Court made plain that its analysis and the strictures of § 2254(d) do not apply to claims that had not been adjudicated on the merits in state court. *Id.* at 1401 (rejecting argument that the majority's holding rendered § 2254(e)(2) superfluous by reasoning that § 2254(d) will not apply when "federal habeas courts . . . consider new evidence when deciding claims that were not adjudicated on the merits in state court").

To the extent that *Pinholster* confronted the adjudication-on-the-merits requirement, interplay between the majority opinion and Justice Sotomayor's dissent lends strength to our holding in *Winston I*. As we found in *Winston I*, Winston was hindered from producing critical evidence to buttress his *Atkins* ineffectiveness claim—such as the 66 IQ score—by the state court's unreasonable denial of discovery and an evidentiary hearing. Like the hypothetical petitioner posited by Justice Sotomayor in *Pinholster*, Winston's inability to produce potentially dispositive evidence in state habeas proceedings came about through no fault of his own. The Court's tacit acknowledgment that the hypothetical petitioner would be free to present new, material evidence—because his claim had not been adjudicated on the merits in state court—thus lends at least some support to our holding in *Winston I*.

In any event, we need not discern in *Pinholster* an enthusiastic endorsement of *Winston I*. Quite the opposite, to disrupt our earlier adjudication we are required to conclude that *Pinholster* "'made a contrary decision of law applicable to the issue,'" *TFWS, Inc.*, 572 F.3d at 191 (quoting *Aramony*, 166 F.3d at 661). This we cannot do. Our holding in *Winston I* was premised on the Supreme Court of Virginia's failure to

adjudicate Winston's *Atkins* ineffectiveness claim on the merits. Absent an adjudication on the merits, we determined that § 2254(d) deference was not owed to the state-court decision.

*Pinholster* would thus impeach *Winston I* only if it rejected our conclusion that the Supreme Court of Virginia's decision was not an adjudication on the merits. We are not persuaded that it did. The Court's opinion contains almost no discussion of the parameters of the adjudication-on-the-merits requirement, beyond its cursory assumption that the state-court decisions at issue satisfied the mandate of § 2254(d). Far from announcing a new rule to govern resolution of whether a claim was adjudicated on the merits in state court, the Court expressly declined to "decide where to draw the line between new claims and claims adjudicated on the merits," *id.* at 1401 n.10. At bottom, nothing in *Pinholster* indicates that the Court's disposition casts doubt on—much less overrules—our discussion of the adjudicated-on-the-merits requirement in *Winston I*.

Nor does *Richter* demand that we reconsider our holding in *Winston I*. The Court there simply presumed that, absent "any indication or state-law procedural principles to the contrary," a summary decision from a state habeas court constitutes an adjudication on the merits. *Richter*, 131 S. Ct. at 784–85. *Richter*'s reasoning is inapposite here, where Winston does not contest the thoroughness of the state-court decision but rather the court's unreasonable denial of his requests for discovery and an evidentiary hearing. We found in *Winston I* that the state court's refusal to allow Winston to develop the record, combined with the material nature of the evidence that would have been produced in state court were appropriate procedures followed, rendered its decision unbefitting of classification as an adjudication on the merits. *Richter* mentions nothing of possible defects in a state-court decision save the summary nature of its disposition, and we accordingly conclude that it does not affect our analysis in *Winston I*.

To forestall the conclusion that *Winston I* remains valid, the Commonwealth emphasizes Justice Sotomayor's citation of the decision in her dissent. Justice Sotomayor cited *Winston I* to support the proposition that "[s]ome courts have held that when a federal court admits new evidence supporting a claim adjudicated on the merits in state court, § 2254(d)(1) does not apply at all and the federal court may review the claim *de novo*," an approach that she claimed the majority rejected. *Pinholster*, 131 S. Ct. at 1417 (Sotomayor, J., dissenting). The Commonwealth maintains that this language necessarily means that the majority overruled *Winston I*.

But the Commonwealth's reliance on Justice Sotomayor's dissent is misplaced. First, as a dissenter, Justice Sotomayor's views on the ramifications of the majority opinion are not sufficient, without more, to compel us to reject the law of the case. Second, we respectfully disagree with Justice Sotomayor's view of *Winston I*. We did not hold that any time a federal habeas court "admits new evidence supporting a claim *adjudicated on the merits* in state court, § 2254(d)(1) does not apply at all," *id.* (emphasis added). We reasoned, rather, that § 2254(d)(1) does not apply to Winston's case, as his *Atkins* ineffectiveness claim was *not* adjudicated on the merits in state court. This principle in fact finds support in Justice Sotomayor's dissent, which acknowledges, "Of course, § 2254(d)(1) only applies when a state court has adjudicated a claim on the merits," *id.* at 1417 n.5. Indeed, Justice Sotomayor "assume[d] that the majority does not intend to suggest that review is limited to the state-court record when a petitioner's inability to develop the facts supporting his claim was the fault of the state court itself." *Id.* Such is the case here. Thus Justice Sotomayor's dissent, if anything, endorses our holding in *Winston I*.

That *Winston I* was not abrogated by intervening Supreme Court precedent also finds support in our recent decision in *Richardson v. Branker*, 668 F.3d 128 (4th Cir. 2012). There, we cited with approval *Winston I*'s holding that the state-court

decision did not qualify as an adjudication on the merits because "Virginia state courts did not afford Winston an evidentiary hearing and thus passed on the opportunity to adjudicate his claim on a complete record." *Richardson*, 668 F.3d at 152 n.26 (alteration and internal quotations omitted). Nevertheless, we distinguished the petitioner's case, in which the state court "held an evidentiary hearing and received evidence," from *Winston I*. *Id.* Nowhere did we express doubt about the continuing validity of *Winston I* in light of *Pinholster* and *Richter*.

C.

Looking past the four corners of the *Pinholster* opinion, the Commonwealth points to two decisions that it asserts establish that *Winston I* is no longer valid. We reject the Commonwealth's interpretations of these cases and locate nothing in them that mandates rejecting our analysis in *Winston I*.

The Commonwealth first contends that our decision in *Jackson v. Kelly*, 650 F.3d 477 (4th Cir. 2011), implicitly determined that *Pinholster* had overruled *Winston I*. We disagree. In *Jackson*, we characterized *Pinholster* as instructing that, "when a habeas petitioner's claim has been adjudicated on the merits in state court, a federal court is precluded from supplementing the record with facts adduced for the first time at a federal evidentiary hearing." 650 F.3d at 492. Although the district court had held an evidentiary hearing on the petitioner's claim—noting generally that the claim had not been adequately developed in state court—we limited our review to the state-court record, concluding that the state court had adjudicated the claim on the merits. *Id.* at 485.

Nowhere in *Jackson*, however, did we illuminate the adjudicated-on-the-merits requirement. Rather, in *Jackson* we merely noted matter-of-factly that which did not seem to be in dispute—that the state court had adjudicated the claim on the merits. Here, in contrast, we are required to critically ana-

lyze the status of the state-court decision. In that regard, we must confront our own prior conclusion—which, as we have explained, we cannot casually overrule—that the Supreme Court of Virginia expressly did *not* adjudicate Winston's *Atkins* ineffectiveness claim on the merits. This important distinction, viewed in tandem with the limited discussion of the adjudication-on-the-merits requirement in *Jackson*, convinces us that the decisions are not incongruous.

Next, the Commonwealth directs our attention to *Atkins v. Clarke*, 642 F.3d 47 (1st Cir. 2011), which it asserts recognizes that *Pinholster* overruled *Winston I*. A closer review of *Clarke* reveals that the Commonwealth's interpretation is erroneous. The petitioner in *Clarke* contended that his claims had not been adjudicated on the merits in state court, and he relied in part on *Winston I* in framing the argument. The First Circuit initially noted unremarkably, "To the extent [*Winston I* is] inconsistent with [*Pinholster*] . . . , [it is], of course, overruled." *Clarke*, 642 F.3d at 49. Because there was "no doubt that this case was adjudicated on the merits," the First Circuit found the petitioner's reliance on *Winston I* misplaced. *Id.* The court did not, as the Commonwealth intimates, suggest that our analysis of § 2254(d) in *Winston I* had been assailed by *Pinholster*. It instead distinguished the case before it from *Winston I*, noting that extending the rule in *Winston I* to cover the petitioner's case—in which all material facts had been presented to the state court—would contravene *Pinholster*. Nothing in the opinion detracts from our holding in *Winston I*.[5]

---

[5]The Commonwealth cites a bevy of other circuit decisions issued after *Pinholster* that reviewed state-court habeas dismissals under § 2254(d). But none of the cases present the factors that we found crucial to our holding in *Winston I*, and the courts in these cases cursorily assumed that the claims had been adjudicated on the merits in state court. The decisions are therefore of little aid to our task.

IV.

After reaffirming that § 2254(d) does not apply to Winston's *Atkins* ineffectiveness claim, which the state court failed to adjudicate on the merits, we proceed to review de novo Winston's claim and the district court's decision to grant habeas relief, *Richardson*, 668 F.3d at 138.

Winston contends that his trial attorneys were ineffective for failing to argue to the jury during sentencing that Winston is mentally retarded. Had the court concluded that he was mentally retarded, *Atkins* would have barred imposition of a death sentence as contrary to the Eighth Amendment's prohibition on cruel and unusual punishments. Virginia law provides that an individual is mentally retarded—and hence ineligible for a death sentence—if he establishes a disability originating before eighteen years of age characterized by "significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning" and "significant limitations in adaptive behavior." Va. Code Ann. § 19.2-264.3:1.1(A). To meet the first prong of the formulation, a petitioner must show an IQ score of 70 or less. *Hedrick v. True*, 443 F.3d 342, 367 (4th Cir. 2006).

Reviewing the claim de novo, we conclude that Winston is entitled to habeas relief. As we explain below, Winston has demonstrated both deficient performance by his attorneys and prejudice, as required under Supreme Court precedent. Had Winston's trial attorneys presented evidence of his mental retardation at sentencing, there is a reasonable probability that the court would not have sentenced him to death. We accordingly affirm the district court's grant of habeas relief.

A.

The familiar *Strickland* formulation governs our ineffectiveness inquiry. To succeed on a claim of ineffective assis-

tance of counsel, a petitioner must demonstrate deficient performance and prejudice. *Richter*, 131 S. Ct. at 787. Review of counsel's actions is hallmarked by deference, and we are mindful that "[i]t is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'" *Id.* at 788 (quoting *Strickland*, 466 U.S. at 689). We are not at liberty to rely on hindsight to reconstruct the circumstances of counsel's conduct, "indulg[ing] '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Id.* at 790 (quoting *Wiggins v. Smith*, 539 U.S. 510, 526 (2003)).

Demonstrating deficient performance requires showing that "'counsel's representation fell below an objective standard of reasonableness.'" *Id.* at 787 (quoting *Strickland*, 466 U.S. at 688). A reviewing court conducting the deficient-performance inquiry "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689). The critical question is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Id.* at 788 (quoting *Strickland*, 466 U.S. at 690).

Yet deference to the decisions of counsel is not limitless. Attorneys have a duty to investigate their client's case so as to enable them to make professional decisions that merit distinction as "informed legal choices." *See Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011). Genuinely evaluating tactical options is a necessity, and "[c]ounsel's lack of preparation and research cannot be considered the result of deliberate, informed trial strategy." *Hyman v. Aiken*, 824 F.2d 1405, 1416 (4th Cir. 1987). The strong presumption that counsel's choices were part of an overarching strategy "does not overcome the failure of . . . attorneys . . . to be familiar with readily available documents necessary to an understanding of their client's case." *Id.*

Once a petitioner has established deficient performance, he must prove prejudice—"'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). Pointing to some "'conceivable effect on the outcome of the proceeding'" is insufficient to satisfy *Strickland*'s demanding test. *Id.* at 788 (quoting *Strickland*, 466 U.S. at 693). "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 792.

## B.

Applying the *Strickland* formulation to the actions of Winston's attorneys during sentencing, we hold that they rendered deficient performance that prejudiced Winston.

As to the first prong of the standard, the failure of Winston's attorneys to review his school records and interview school officials about his mental functioning amounts to deficient performance. Counsel were obligated "to be familiar with readily available documents necessary to an understanding of [Winston's] case," *Hyman*, 824 F.2d at 1416. By neglecting to review Winston's school records and instead relying on Nelson to ascertain their import, counsel abdicated their responsibility. As the attorneys admitted, reading the documents would have raised the potential for a successful claim that *Atkins* barred imposition of a death sentence on Winston. This would have prompted them to interview Winston's school teachers and counselors, facilitating an investigation that carried dual significance under Virginia's mental-retardation statute. Not only would interviews with school officials have enabled counsel to obtain from Lageman Winston's 66 IQ score, these conversations would have provided counsel with compelling evidence of Winston's limitations in adaptive behavior, which in turn would have prompted them

to press Nelson to explore further the merits of mental retardation as a sentencing defense.

Counsel's lack of diligence in pursuing a mental-retardation defense contravened their duty to investigate to make defensible professional decisions qualifying as "informed legal choices." *See Elmore*, 661 F.3d at 858. Contrary to the Commonwealth's suggestions, the presumption that the attorneys' omissions were part of trial strategy "does not overcome [their] failure . . . to be familiar with readily available documents," *Hyman*, 824 F.2d at 1416. As in *Hyman*, counsel's "lack of preparation and research cannot be considered the result of deliberate, informed trial strategy," *id.*

Having shown deficient performance, Winston has also demonstrated "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,'" *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694). Establishing a successful *Atkins* defense to a death sentence requires presenting proof of an IQ of 70 or below, *Hedrick*, 443 F.3d at 367, and "significant limitations in adaptive behavior," Va. Code Ann. § 19.2-264.3:1.1(A). As to the first prong, had counsel reviewed the school records and found the Reclassification, they testified that they would have interviewed Lageman and searched for a potential below-70 IQ score. And Lageman, as she testified, would have given Winston's attorneys the report of Winston's 66 IQ score. Investigation by counsel would have similarly uncovered evidence of significant limitations in Winston's adaptive behavior. Through interviews of school officials and review of school records, counsel could have presented evidence at sentencing demonstrating that Winston met the second prong of the mental-retardation test.

Nelson's testimony at the federal evidentiary hearing further bolsters our conclusion that Winston has shown prejudice. Nelson, the court-appointed mental-health expert, conceded that he could not remember reading the Reclassifi-

cation. Nor was he presented with the 66 IQ score or information from school officials and counselors. A close review of such documents, according to Nelson, would have been important to his analysis, including his conclusions about Winston's adaptive functioning. "It's certainly possible," testified Nelson, "my opinion might have been different with this wealth of other information." J.A. 720.

Considering the question anew, we therefore agree with the district court that, "had counsel read the overlooked records, followed up, raised the issue, and marshaled the evidence" of mental retardation, *Winston*, 784 F. Supp. 2d at 634, there is a reasonable probability that the outcome of the proceeding would have been different. Accordingly, Winston is entitled to habeas relief.

The Commonwealth attempts to resist this result by referencing the district court's alleged disregard of § 2254(e)(1)and our decision in *Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008). Its contentions are unavailing.

Turning first to the import of § 2254(e)(1), because the Supreme Court of Virginia refused discovery and an evidentiary hearing—and the evidence that would have been gleaned from these vehicles is critical to Winston's claim—its decision includes few factual findings to which we must defer under § 2254(e)(1). The district court properly credited the state court's findings that Winston had scored 77, 76, and 73 on three IQ tests and that Winston could have been classified by the school system as mentally retarded without scoring 70 or below on an IQ test. But it correctly found that the new evidence produced by Winston—pursuant to which the state court made no factual findings—compelled granting him relief. Section 2254(e)(1) obviously presupposes that the state court made factual findings to which a federal habeas court might defer. Thus where the state court failed to adjudicate a claim on the merits by refusing to facilitate production of

new, material evidence, meaningful deference to its factual findings is well-nigh impossible.

Similarly, the Commonwealth's reliance on *Green* is unpersuasive. The Commonwealth maintains that *Green* stands for the proposition that federal courts are bound by a state court's determination that presentation of a single below-70 IQ score, when accompanied by three above-70 scores, does not satisfy the statutory definition of subaverage intellectual functioning. The Commonwealth's argument is misplaced, for two reasons. First, we reviewed the state-court decision in *Green* for objective unreasonableness under § 2254(d). 515 F.3d at 300. In contrast, we review Winston's ineffectiveness claim de novo. Second, the state court in *Green* discredited the lone below-70 score, leaving it to consider three above-70 scores. *Id.* Here, however, the Supreme Court of Virginia did not impugn the validity of Winston's 66 IQ score, as it did not even review it.

To summarize, we agree with the district court that Winston has made a clear showing of prejudice flowing from his attorneys' deficient performance. Presentation of the 66 IQ score, the Reclassification, and testimony from school officials and counselors would have significantly strengthened Winston's sentencing case such that we can confidently ascertain a "'reasonable probability that, but for counsel's unprofessional errors,'" *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694), the court would not have sentenced Winston to death.

## V.

In his cross-appeal, Winston asks us to revise the remedy ordered by the district court to reflect that he is entitled to a new full sentencing proceeding. We find modifying the relief ordered by the district court both unwarranted and unnecessary in light of our understanding of the district court's statement of remedy.

The district court had no authority to fashion a particular procedure to remedy the *Atkins* violation. *See Henderson v. Frank*, 155 F.3d 159, 168 (3d Cir. 1998) ("This is not a direct appeal from a federal conviction, where upon vacating the judgment this Court would have unlimited power to attach conditions to the criminal proceedings on remand. Rather, this is federal habeas corpus relating to a state conviction." (citation omitted)). We therefore construe the district court's directive to the Commonwealth to "conduct a trial on the question of whether Winston is mentally retarded, and sentence him accordingly," J.A. 635, as not restricting the range of remedies for the *Atkins* violation to a single-issue trial on mental retardation. Instead, that language must be understood to mean that, should the Commonwealth continue to seek the death penalty, Virginia law governs the question of whether our grant of the writ necessitates an entirely new sentencing phase or permits a narrow trial on the issue of mental retardation. Having afforded Winston habeas relief, at this stage we leave it to the Commonwealth's prerogative to craft a remedy consonant with the strictures of state law.

Framing the district court's order in its proper context moreover persuades us that the cross-appeal is likely moot. The Commonwealth has conceded in its supplemental briefing that, if Winston is entitled to relief, state law likely requires it to give Winston a full resentencing proceeding. This is all that Winston requests.

## VI.

For the foregoing reasons, we affirm the district court's grant of habeas relief.

*AFFIRMED*